**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1887**

HUI PAN,

                    Petitioner,

          v.

ERIC H. HOLDER, JR., Attorney General,

                    Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 19, 2013          Decided: December 17, 2013

Before TRAXLER, Chief Judge, and MOTZ and KEENAN, Circuit Judges.

Petition for review denied by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Motz and Judge Keenan joined.

**ARGUED:** Joshua A. Berman, BLAINE L. GILBERT & ASSOCIATES, PA, Baltimore, Maryland, for Petitioner. Stephen McCoy Elliott, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Stuart F. Delery, Principal Deputy Assistant Attorney General, Civil Division, Erica B. Miles, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

TRAXLER, Chief Judge:

Hui Pan, a native and citizen of China's Fujian Province, petitions for review of the denial of his application for asylum and withholding of removal based on his claim that government officials will sterilize him if he returns to China. See 8 U.S.C. § 1101(a)(42). Pan also seeks review of the denial of his claim under the Convention Against Torture ("CAT"). We deny his petition.

## I.

In November 2008, Pan left his home in the Jin'an District of Fuzhou City for the United States. He ended up in Baltimore, Maryland, where he is living with his uncle while his application for asylum works its way through the system. Pan arrived in the United States without valid entry documents, and the Department of Homeland Security ("DHS") detained him and conducted a credible fear interview. During the interview, Pan claimed that if he returned to China, family planning officials would forcibly sterilize him for violating China's one-child policy. Pan stated that he and his wife, Xiaojuan Chen, already had a daughter when Chen became pregnant in November 2008. According to Pan, when local family planning officials discovered the pregnancy, they forced Chen to have an abortion and beat Pan for resisting. Pan explained that officials took steps to sterilize Chen soon after the abortion but decided she

2

was "not suitable" for sterilization and that Pan would have to be sterilized instead.  J.A. 354.  When the interviewing officer asked why Chen was unsuitable, Pan answered that government officials "did not explain why she was not able" to be sterilized.  J.A. 354.  The asylum officer determined that there was "a significant possibility that the assertions underlying [Pan's] claim could be found credible," J.A. 350, and referred his case for a full asylum determination by an immigration judge ("IJ").

The DHS placed Pan in removal proceedings, charging him as removable for being present in the United States without having been admitted.  See 8 U.S.C. § 1182(a)(7)(A)(i)(I).  Pan conceded removability and applied for asylum, withholding of removal and relief under the CAT.  In support of his asylum application, Pan submitted a written statement that elaborated on various statements he made during his credible fear interview.  Pan stated that Chen was three months pregnant when "Birth Control Bureau" personnel appeared at his home on November 25, 2008, charging that Chen's pregnancy violated Birth Control Regulations and that an abortion was required.  When Pan attempted to stop them, three men "pushed [him], beat [him] and kicked [him] with their feet."  J.A. 234.  According to Pan's statement, officials then took Chen away, performed the abortion and sent her back home the following day.  Pan claims, moreover,

3

that government officials returned three days later on November 28 and took her away once again—this time to sterilize her. But as it so happened, Pan alleged, doctors did not perform "a tubal ligation because of her health reasons." J.A. 235. Pan stated that he was not at home during this second visit by government officials, and that when he returned later that day, he found a notice in his mailbox requiring him to report for sterilization on November 30. After a discussion with his family, Pan decided to flee to the United States without his family. He claimed that he left home on the morning of November 30, 2008, and hid with friends until the middle of December, at which time he left for Beijing. Pan did not specify the location of his initial hiding place. According to his application, Pan stayed in Beijing for two days before flying to Rome. He spent one day in Rome and then flew to Mexico before arriving in the United States in January 2009. Pan's asylum application made no mention of a smuggler and did not address how, if at all, he obtained the travel documents necessary to make such a trip.

Pan submitted several corroborating documents with his application, including a "Fuzhou Surgery Certificate" dated November 25, 2008, the day of the abortion, indicating that Chen was pregnant and that "[i]nduced abortion is to be performed," J.A. 246; a "Fujian Women and Children Health Center Disease Explanation Form" dated November 28, 2008, stating that

4

"[b]ecause . . . Chen has [a] serious skin disease (skin damages) on her skin around the area where she had her operation, it is not advisable for her to get a tubal ligation," J.A. 249; a notice dated November 28, 2008, that was purportedly issued by the Fuzhou Jin'an District Birth Control Bureau directing Pan to report for sterilization on November 30; a marriage certificate for Pan and Chen; and a birth certificate indicating a daughter was born to Pan and Chen on June 24, 2008.

During his asylum hearing, Pan testified he believed Chen was two months pregnant at the time she was forced to undergo the abortion, but admitted he "[could not] remember clearly." J.A. 97. Pan recalled that when Chen returned home after the abortion, she had a bandage "[a]round [her] stomach," looked "pale and weak," and had difficulty walking. J.A. 99-100. Pan testified that he did not ask Chen for details about the abortion. In explaining why family planning officials decided to have him, rather than Chen, sterilized, Pan told the IJ that Chen could not undergo a sterilization procedure because of a "skin problem." J.A. 77.

Pan also testified in greater detail regarding his flight from China to the United States. According to Pan, on the same evening he received notice that the government intended to sterilize him, his parents located and hired a smuggler to get

5

him out of China. Pan, however, professed not to know whether or to what extent his parents compensated the smuggler.

Pan stated that on the morning of November 30, 2008, he left for the Mawei District in Fuzhou City where he hid with a friend for two days. Pan testified that after hiding in Fuzhou City for two days, he traveled to Beijing, as arranged by the smuggler, where he stayed for another two days in a house owned by someone he did not know. Finally, Pan testified that he flew to Rome using a passport issued in his actual name and obtained on his behalf from the Chinese government by someone he could not identify. Pan indicated he no longer had this Chinese passport because it was "exchanged" at some point for a Japanese passport. From Rome, Pan flew to Mexico City and then rode in a truck to the Texas border where he was detained by DHS.

The IJ asked Pan how he obtained his corroborating documents for the asylum hearing. Pan responded that friends of his parents brought the documents from China to the United States "discreetly, secretly" and left them with his aunt and uncle in Baltimore. J.A. 88. Pan was unable to name these family friends or provide any contact details for them. When asked to explain why he did not call his aunt or uncle as witnesses to verify receipt of the documents, Pan told the IJ they had to work.

6

The IJ found that neither Pan's testimony nor his supporting documentation was credible. The IJ offered several reasons to support the adverse credibility determination. First, the IJ found it implausible that Pan's parents could locate and hire a smuggler so quickly—on the same day, in fact, that Pan allegedly learned the government intended to sterilize him. Second, the IJ concluded Pan's testimony about where and with whom he hid in Fuzhou City was vague and inconsistent. Third, the IJ was troubled by Pan's inability to provide details about Chen's abortion beyond a general description of her physical appearance and condition following the procedure. Finally, the IJ expressed "major concern . . . as to the authenticity of the documents." J.A. 45. The IJ observed that "the documents were allegedly provided by an unknown courier to the uncle whose testimony could have been provided today, but was not provided." J.A. 46. Based on Pan's lack of credibility and the absence of credible independent evidence supporting his claim, the IJ denied Pan's application for relief.

The Board of Immigration Appeals ("BIA") adopted and affirmed the IJ's decision and dismissed Pan's appeal. In concluding that the adverse credibility determination was not clearly erroneous, the BIA reiterated the IJ's specific reasons and offered additional reasons to support the adverse credibility determination. First, the BIA observed that when

7

Pan began his testimony about the events surrounding Chen's forced abortion, he did not mention being beaten by officials even though that allegation was featured in his credible fear interview and his asylum application. Second, the BIA concluded that Pan's testimony regarding how long Chen had been pregnant at the time of the abortion was inconsistent with the Fuzhou Surgery Certificate he submitted. Third, the BIA found that Pan's explanation that Chen could not be sterilized due to an unspecified skin condition was vague and unclear. Having concluded that the IJ "gave specific and cogent reasons for finding Pan's testimony incredible, which are supported by the record," the BIA examined the "corroborating documentation [Pan] submitted" and concluded the documents were "inherently unreliable," J.A. 3, and that Pan did not authenticate the documents through any means whatsoever. The BIA therefore concluded that the corroborating evidence offered by Pan "did not rehabilitate [his] testimony," id., and that Pan failed to establish eligibility for asylum or withholding of removal. Finally, the BIA stated additionally that the "totality of the record [did] not establish that [Pan] would more likely than not be subject to torture upon his return to China" within the meaning of the CAT, id.

8

"The scope of our review of a final order of removal denying asylum [or withholding of removal] is narrow," Dankam v. Gonzales, 495 F.3d 113, 119 (4th Cir. 2007), requiring us to affirm the order as long as it is not "manifestly contrary to law," 8 U.S.C. § 1252(b)(4)(C). Federal appellate courts review factual findings, including adverse credibility determinations, using the "substantial evidence" standard. See Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011); Dankam, 495 F.3d at 119. Under this deferential standard, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Therefore, "[w]hen the denial of asylum is based on the conclusion that the applicant failed to meet his evidentiary burden for establishing eligibility, . . . then we review for substantial evidence and must affirm a determination of statutory ineligibility by the BIA unless the 'evidence presented was so compelling that no reasonable factfinder could fail to find' eligibility for asylum." Dankam, 495 F.3d at 119 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992)). This means that when "the record plausibly could support two results: the one the IJ chose and the one the petitioner advances, reversal is only appropriate where the court finds that the evidence not only supports the opposite conclusion, but

9

compels it." Niang v. Gonzales, 492 F.3d 505, 511 (4th Cir. 2007) (alterations and internal quotation marks omitted). Finally, "[b]ecause the BIA affirmed the IJ's order and supplemented it," we apply these standards of judicial review to "the factual findings and reasoning contained in both decisions." Niang, 492 F.3d at 511 n.8.

III.

A.

The Immigration and Nationality Act (the "INA") authorizes the Secretary of Homeland Security or the Attorney General to confer asylum on any alien who establishes refugee status. See 8 U.S.C. § 1158(b)(1)(A). An applicant for asylum bears the burden of proving that he or she is a refugee, see 8 U.S.C. § 1158(b)(1)(B)(i), meaning that he or she is "unable or unwilling to return to . . . [his or her] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(A)(42)(A). Applicants "may satisfy this burden by showing either that they were subjected to past persecution or that they have a well-founded fear of future persecution on account of" one of the enumerated grounds. Djadjou, 662 F.3d at 272 (internal quotation marks and alterations omitted). The INA specifically permits victims of China's population control policy to seek political asylum:

10

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(42). Pan attempted to prove his refugee status by demonstrating a well-founded fear of future persecution. Although Pan testified about past mistreatment he suffered while resisting officials as they forcibly removed Chen to terminate her pregnancy, the clear thrust of Pan's claim is that he fears family planning officials will sterilize him if he is removed to China.[1]

---

[1] Because both the IJ and the BIA denied Pan's claim based on the adverse credibility determination, neither provided a considered analysis of the extent to which Pan's claim was premised on past persecution or a fear of future persecution. Regarding the past persecution component, the IJ expressed doubt that the alleged beating would rise to the level of "persecution" within the meaning of the statute. Ultimately, the IJ did not decide the question and rested the denial of relief on the adverse credibility determination. Although the BIA adopted the denial of relief based on the adverse credibility finding, it noted in passing that Pan "has not asserted that he fears future persecution based on anything other than his discredited claim of past persecution." J.A. 4. Our review of the record leads us to a different conclusion. Pan's claim of future persecution is based primarily on events that occurred after his wife's forced abortion. Pan's testimony regarding Chen's abortion merely provides context for his well-founded fear story. We recognize, moreover, that Pan cannot base his asylum claim on Chen's forced abortion, see Ni v. (Continued)

11

The "well-founded fear of persecution" standard consists of a subjective and objective component. The subjective part requires the alien to "present[] candid, credible, and sincere testimony demonstrating a genuine fear of persecution." Ngarurih v. Ashcroft, 371 F.3d 182, 187 (4th Cir. 2004) (internal quotation marks omitted). "The objective element requires a showing of specific, concrete facts that would lead a reasonable person in like circumstances to fear persecution." Id. at 187-88.

"The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). Because "the subjective element cannot generally be proved other than through the applicant's testimony," however, "a determination that the applicant's testimony is not credible will generally defeat the claim," Camara v. Ashcroft, 378 F.3d 361, 369-70 (4th Cir. 2004), unless the would-be asylee is able to prove eligibility

---

Holder, 613 F.3d 415, 425 (4th Cir. 2010), but we see no reason to think he was asserting such a derivative claim here.

12

with evidence independent of the discredited testimony, see Tassi v. Holder, 660 F.3d 710, 725-26 (4th Cir. 2011).

B.

Under the REAL ID Act, an IJ, after "[c]onsidering the totality of the circumstances, and all relevant factors," may make an adverse credibility determination based on factors such as "responsiveness of the applicant . . . , the inherent plausibility of the applicant's . . . account, the consistency between the applicant's . . . written and oral statements. . . , the internal consistency of each such statement, the consistency of such statements with other evidence of record . . . , or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii). A credibility determination may rest on any relevant factor even if such factor does not "go[] to the heart of the applicant's claim." Id. The REAL ID Act's credibility provision affords a flexible, "commonsense approach" to credibility determinations, Singh v. Holder, 699 F.3d 321, 329 (4th Cir. 2012) (internal quotation marks omitted), but also ensures that an IJ does not "cherry pick solely facts favoring an adverse credibility determination while ignoring facts that undermine that result," Shrestha v. Holder, 590 F.3d 1034, 1040 (9th Cir. 2010); cf. Shah v. Attorney Gen. of the United States, 446 F.3d 429, 437 (3d Cir. 2006) ("Although we don't expect an Immigration Judge to search for ways to sustain an alien's testimony, neither do

13

we expect the judge to search for ways to undermine and belittle it. Nor do we expect a judge to selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach.") (citation omitted). When an adverse credibility determination has been made, this court must assess whether the IJ or BIA identified non-speculative, "specific, cogent reason[s]" in support of the adverse credibility finding. Dankam, 495 F.3d at 120-21 (internal quotation marks omitted). If an adverse credibility finding is based on speculation and conjecture rather than specific and cogent reasoning, it is not supported by substantial evidence. See Tewabe v. Gonzales, 446 F.3d 533, 538 (4th Cir. 2006).

## C.

We conclude that the adverse credibility finding is supported by substantial evidence. The IJ and the BIA identified specific and cogent reasons supporting this finding. Although not all of the stated grounds necessarily withstand scrutiny, we conclude that, on balance, substantial evidence supports the adverse credibility determination.

The BIA concluded that Pan's testimony regarding why Chen could not be sterilized—resulting in the government's decision to sterilize him instead—was vague and unclear. Although vagueness and lack of specificity are not factors specifically

14

listed in the REAL ID Act's credibility determination provision, they qualify as "other relevant factor[s]" that an IJ may consider. 8 U.S.C. § 1158(b)(1)(B)(iii); see Shrestha, 590 F.3d at 1040; cf. Dorosh v. Ashcroft, 398 F.3d 379, 382 (6th Cir. 2004) ("Under BIA rulings, credibility encompasses not just consistency but also plausibility and sufficient detail."); Elzour v. Ashcroft, 378 F.3d 1143, 1152 (10th Cir. 2004) (same). Pan claims that family planning officials decided to sterilize him after it was discovered that Chen could not be sterilized by means of a tubal ligation because of a condition Pan described as a "skin disease" or "skin problem." To corroborate his story, Pan offered a photocopy of a "Fujian Women and Children Health Center Disease Explanation Form" stating that "[b]ecause . . . Chen has [a] serious skin disease (skin damages) on her skin around the area where she had her operation, it is not advisable for her to get a tubal ligation." J.A. 249. It bears a seal and an illegible signature. The document does not elaborate on Chen's "skin disease" or explain the "operation" referenced, and it is unclear whether or if the unspecified operation caused or exacerbated some preexisting condition. When asked to provide details about this operation, Chen speculated that "[i]t should be the abortion" but admitted he was not certain. J.A. 99. The only details Pan offered regarding Chen's post-abortion condition were that she looked

15

pale and weak, was having difficulty walking, and had a bandage around her stomach. On this record, the BIA could only guess at Chen's purported skin disease, how and when she acquired it, and how it would render her unsuitable for a sterilization procedure.

Next, the BIA concluded that Pan's credibility was undermined by his vague and inconsistent testimony regarding the circumstances of his flight from China to the United States. Pan testified that on the same day he received the sterilization notice, he consulted with his family and decided to flee China. He testified that his parents were able to immediately arrange for a smuggler to get him out of China to the United States where he had family in Baltimore. According to Pan, he left home and hid in another part of Fuzhou City for two days. The IJ and Pan then had the following colloquy:

Q. . . . [W]hen did you leave your house?

A. In the morning of November 30, 2008 . . . .

Q. And where did you go?

A. I hid[] in Fuzhou City, Mawei District.

. . .

Q. With whom did you stay?

A. Somebody.

Q. Who?

A. Just myself.

16

Q. How is it you hid yourself? Where did you sleep? Where did you eat? Where did you go at night?

A. I hid in the small room the entire day.

Q. In whose house was the small room located?

A. My friend helped me to arrange for that room.

Q. And who is your friend?

A. My friend, just my friend.

Q. You don't have a name?

A. The name is Tao Wang.

Q. . . . You seem to be having difficulty, in my view, of giving any specifics as to the name of the person who helped you hide, and I'm wondering why. I want to give you an opportunity to explain that.

A. Because even if I -- even when I told you this person you would not know who this person was.

J.A. 81-82. The BIA agreed with the IJ's conclusion that Pan's testimony was uncertain and unclear:

At first, [Pan] testified that he could not remember the name of the person with whom he stayed while in hiding. Then, he testified that . . . a friend helped arrange the room. In his asylum application statement, he stated that he stayed at a friend's house. According to [Pan's] credible fear worksheet, he did not mention going into hiding before leaving China at his interview.

J.A. 9.

In response, Pan offers a plausible explanation for these inconsistencies, suggesting that his uncertain testimony was reasonable given the language barrier and that the IJ and BIA simply misinterpreted his answers. An immigration judge,

17

however, is not required to accept every plausible explanation offered by an asylum applicant. See Dankam, 495 F.3d at 122. An applicant "must do more than offer a plausible explanation for his inconsistent statements to secure relief; he must demonstrate that a reasonable fact-finder would be compelled to credit his testimony." Majidi v. Gonzales, 430 F.3d 77, 80-81 (2d Cir. 2005) (internal quotation marks omitted). Were we considering this testimony in the first instance, we may well have dismissed these minor inconsistencies as simply the result of the language barrier. Our function, however, is not to re-weigh the evidence and come to an independent conclusion but to determine whether the record compels us to find Pan credible. We conclude it does not.[2]

---

[2] By contrast, the BIA's conclusion that Pan's testimony was implausible to the extent he claimed his parents immediately secured aid from a smuggler is, on this record, based on speculation. See Jiang v. Gonzales, 485 F.3d 992, 996 (7th Cir. 2007) (reversing an adverse credibility finding "based on [the IJ's] own assumptions of how long it should take Chinese residents to arrange passage to the United States," noting that the "Fujian province has a 'huge' network of smugglers that work in concert together" and that the IJ pointed to no evidence suggesting the applicant was incapable of securing arrangements to leave in one day). Here, the IJ pointed to nothing in the record suggesting that a smuggler could not be hired immediately. This particular basis for doubting Pan's testimony therefore does not constitute a cogent reason for the adverse credibility finding.

Finally, the BIA affirmed the IJ's conclusion that Pan's corroborating documentation was unreliable and failed to rehabilitate Pan's credibility. "[W]hen a trier of fact is not fully satisfied with the credibility of an applicant's testimony standing alone, the trier of fact may require the applicant to provide corroborating evidence 'unless the applicant does not have the evidence and cannot reasonably obtain the evidence.'" Singh, 699 F.3d at 329 (quoting 8 U.S.C. § 1158(b)(1)(B)(ii)). An adverse credibility finding is generally fatal to an asylum claim unless the alien proves his refugee status through evidence independent of his own testimony. See Rusu v. INS, 296 F.3d 316, 323 (4th Cir. 2002).

The agency's conclusion was based primarily on Pan's failure to authenticate the documents. "[A]uthentication requires nothing more than proof that a document or thing is what it purports to be and, even though the Federal Rules of Evidence spell out various options, the rules also stress that these options are not exclusive and the central condition can be proved in any way that makes sense in the circumstances." Yongo v. INS, 355 F.3d 27, 30–31 (1st Cir. 2004); cf. Tassi, 660 F.3d at 720-21 (explaining that the BIA may not reject corroborative evidence solely because it does not comply with the Federal Rules of Evidence). Other than his own discredited testimony

19

that he obtained the documents via an unknown courier who brought the documents from China to his uncle in Baltimore, Pan did not make any attempt to establish how he acquired the documents or that the documents were genuine.

Notably, Pan did not avail himself of one obvious source of corroborating evidence. As the IJ observed, Pan did not call his uncle, who lived in Baltimore where the asylum hearing took place, as a witness to verify that he received the documents from China. Pan explained that his uncle could not testify because he had to work, but Pan did not even submit an affidavit from his uncle.

Likewise, there were no affidavits from Pan's parents establishing that they dispatched a courier with the documents. See Chen v. Attorney Gen., 676 F.3d 112, 117 (3d Cir. 2011) (concluding the BIA "properly observed that the Village Committee document had not been authenticated by any means at all, such as an affidavit from [applicant's] mother as to how the document was obtained"). Moreover, the BIA concluded some of the documents were inherently unreliable for reasons other than Pan's failure to authenticate them. For example, the BIA concluded that the sterilization notice had little probative value because it was a photocopy of an unsigned document allegedly issued by local officials. See Matter of H-L-H, 25 I. & N. Dec. 209, 214 (BIA 2010) (according minimal weight to

20

documents purportedly issued by local officials that were "unsigned and unauthenticated and fail[ed] to even identify the authors"), abrogated on other grounds by Huang v. Holder, 677 F.3d 130 (2d Cir. 2012). Likewise, the BIA accorded little probative value to the disease explanation form which did not legibly identify the doctor who purportedly created the form and set forth a confusing and "vague[] descri[ption]" of the skin condition that rendered Pan's wife unsuitable for sterilization. J.A. 3. Finally, the BIA discounted the Fuzhou Surgery Certificate, which purportedly established that an abortion was performed, because it conflicted with Pan's testimony regarding how many months into her pregnancy Chen was when she had the abortion. These determinations are supported by substantial evidence, and the record does not compel a contrary conclusion.[3]

---

[3] Pan also contends that the BIA engaged in impermissible fact-finding in violation of 8 C.F.R. § 1003.1(d)(3)(iv) by identifying additional facts supporting the IJ's determination that the corroborating documents were unreliable. This argument is wholly without merit. As we have previously explained, this regulation "restricts the BIA's ability to add new evidence to the record, but does not prohibit the BIA from making a factual determination upon de novo review of the record before it." Lin v. Mukasey, 517 F.3d 685, 692 n.10 (4th Cir. 2008) (alterations and internal quotation marks omitted). The additional reasons offered by the BIA to support its conclusion that Pan's documentation was unreliable are "properly characterized as . . . factual determination[s] made upon de novo review of the existing record, not as an instance of independent factfinding." Id. (internal quotation marks omitted).

IV.

For the foregoing reasons, we deny the petition to review the BIA's decision affirming the denial of asylum and withholding of removal. To the extent that Pan petitions for review of the BIA's denial of relief under the Convention Against Torture, we conclude the agency's decision is supported by substantial evidence. The BIA reviewed the record and reasonably found that the totality of the circumstances fails to establish Pan would "more likely than not . . . be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

PETITION FOR REVIEW DENIED