**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-1047**

ANSAR HASSEN HUSSEN,

Petitioner,

v.

PAMELA JO BONDI, Attorney General,

Respondent.

**No. 23-2197**

ANSAR HASSEN HUSSEN,

Petitioner,

v.

PAMELA JO BONDI, Attorney General,

Respondent.

**No. 24-1257**

ANSAR HASSEN HUSSEN,

Petitioner,

v.

PAMELA JO BONDI, Attorney General,

Respondent.

_____

On Petitions for Review of Orders of the Board of Immigration Appeals.

_____

Argued:  December 11, 2024                          Decided:  April 22, 2025

_____

Before NIEMEYER, KING, and BENJAMIN, Circuit Judges.

_____

Petition No. 23-1047 denied, Petition No. 23-2197 granted and remanded for further proceedings, and Petition No. 24-1257 denied as moot by published opinion.  Judge Niemeyer wrote the opinion, in which Judge King and Judge Benjamin joined.

_____

**ARGUED:**  Daniel Aaron Diskin, GARFIELD LAW GROUP, PC, Washington, D.C., for Petitioner.  Rachel Pearl Berman-Vaporis, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:**  David Garfield, GARFIELD LAW GROUP, PC, Washington, D.C., for Petitioner.  Brian M. Boynton, Principal Deputy Assistant Attorney General, Edward E. Wiggers, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

2

NIEMEYER, Circuit Judge:

Ansar Hassen Hussen, a native and citizen of Ethiopia, was admitted to the United States on a B-2 visitor visa on January 15, 2014, which authorized him to remain in this country for six months.  He has never left, however.

In June 2014, Hussen applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), claiming that he had twice been imprisoned and beaten for belonging to a minority political party in Ethiopia.  He claimed that he had been "subjected to arrests, detentions, interrogations, [and] beatings" by the governing regime in Ethiopia "because of [his] political opinion and [his] ethnicity."  An immigration judge (IJ), however, found Hussen's account implausible and rejected his application, and the Board of Immigration Appeals (BIA) affirmed, agreeing that material aspects of Hussen's story did not add up.  Hussen filed a petition for review, No. 23-1047.

While that petition was pending, Hussen married a U.S. citizen, who then filed an I-130 application for an immigrant visa on his behalf.  Hussen then filed a motion with the BIA to reopen his proceedings so that he could seek an adjustment of status based on his marriage.  He attached affidavits, photographs, receipts for items like a diamond engagement ring, an Islamic marriage contract, and a lease agreement showing that the couple jointly rented an apartment in Virginia.  The BIA, however, denied Hussen's motion to reopen, concluding that Hussen's evidence was "insufficient" because he failed to provide "clear and convincing evidence of the bona fides of [his] marriage."  From the BIA's denial of his motion to reopen, Hussen filed a second petition for review, No. 23-2197.

3

While Hussen's second petition for review was pending, he filed another motion with the BIA to reopen the proceedings and to reconsider its denial of his earlier motion to reopen. He attached evidence showing that his wife was pregnant, that they were living together, and that they shared a joint bank account. The BIA denied Hussen's motion for reconsideration and second motion to reopen, and Hussen filed a third petition for review, No. 24-1257.

For the reasons that follow, we deny Hussen's first petition, No. 23-1047; we grant his second petition, No. 23-2197, vacate the BIA's order denying Hussen's motion to reopen, and remand for further proceedings consistent with this opinion; and we deny his third petition, No. 24-1257, as moot.

## I. Petition No. 23-1047

In support of his application for asylum, withholding of removal, and relief under CAT, Hussen presented evidence to an IJ of two instances where he was allegedly persecuted for his political beliefs. He stated that when the Ethiopian People's Revolutionary Democratic Front (EPRDF) came to power, it focused on advancing the interests of the Tigrayan ethnic group, while Hussen and his family were part of the Silt'e ethnic group. As a result, the EPRDF confiscated a business belonging to Hussen's father and subjected another to such exorbitant taxes that his father was forced to close it. Hussen said that he thus grew up resenting the EPRDF.

In late 2005, Hussen participated in a protest at his high school that the local police broke up. Hussen managed to evade law enforcement, but, while walking home, he passed

4

by another high school where students were also demonstrating. He claimed that he was rounded up there and detained as part of a mass arrest. He stated that during his two-day detention, the police forced him and other students to walk barefoot over gravel for 15 to 20 minutes, striking the students with batons when they did not walk fast enough. He asserted that he was struck in the back and hand during those occasions. He was released after he read a statement on videotape saying that he was a "dangerous hooligan" who had been trying to disrupt school activities.

For several years thereafter, the EPRDF regime did not interfere with Hussen's life, and he graduated from high school and college. And in October 2010, he obtained a job with the EPRDF government as an expert at the Ministry of Finance and Economic Development. Even so, he contended that his success there was hindered by his refusal to join the EPRDF.

Hussen stated that in February 2013, he joined an opposition political party known as the Blue Party, attending monthly meetings, making financial contributions, engaging in fundraising, and distributing flyers. To substantiate his Blue Party membership, he submitted a letter from one of the party's organizers, who stated that he knew Hussen through Hussen's work on behalf of the party. He also attached a copy of an invitation he received to a Blue Party dinner reception.

Several months after joining the Blue Party, Hussen participated in one of its demonstrations, which the government had permitted to take place and which thousands of people attended. But, according to Hussen, the police came to his house the night after the demonstration and arrested him at gunpoint. He was detained and then interrogated about

5

his involvement with the Blue Party. Hussen alleged that when the interrogators thought he was not answering their questions honestly, he was slapped; hit in the head, back, and hand; kicked twice in the thigh; and struck in the stomach with a baton. After two days, he was released on the conditions that he report to authorities once a week and cease protesting. Upon his release, Hussen sought medical treatment and received a medical record that stated he was seen for soft tissue injury secondary to fighting. He then returned to work.

Shortly after returning to work, Hussen decided to seek greater opportunities elsewhere, and he applied for and was accepted into a one-year master's program at Peking University on a full scholarship paid for by the Chinese government. He obtained a visa and left Ethiopia for China in August 2013. While in China, Hussen stated that he attended an event sponsored by the Ethiopian Students' Association where two Ethiopian embassy officials spoke favorably about the EPRDF. In response, Hussen spoke up, criticizing the EPRDF's "ethnic and political favoritism." After this event, Hussen stated that he made a firm decision not to return to Ethiopia. Instead, he applied for and received a visa to the United States. He arrived in the United States in January 2014 and has worked here since as a ride-share driver and a business intelligence developer.

After considering this evidence, the IJ denied Hussen's application for relief and ordered that he either voluntarily depart or be removed to Ethiopia. The IJ found that Hussen was not credible, explaining that certain portions of Hussen's account were "very vague" and others implausible. He noted, for instance, that the government would have known about Hussen's political activity from 2005 when it hired him to work at the

6

ministry, and the IJ found it "implausible that [the government] could not have stopped him from departing Ethiopia had they wanted to." He also noted that "[r]eliable independent corroboration of party membership and activity were reasonably available," yet Hussen had provided only "an affidavit from someone purporting to be a Blue Party member" that was "not on letterhead" and that provided few details. The IJ further found unpersuasive the handwritten medical note that Hussen had provided as evidence that he had been beaten by police, noting that it did not indicate the location or severity of his injuries. Finally, the IJ found it "implausible and unpersuasive" that Hussen had been targeted for arrest after the large June 2, 2013 demonstration, when he "appeared to be not more than a casual participant" and not even the Blue Party's leadership had been arrested after the protest.

Alternatively, the IJ concluded that even if he were to have credited Hussen's testimony, his treatment would not "rise to the level of persecution." And even if it did, the resulting "legal presumption of future persecution" would have been rebutted because updated country-conditions evidence indicated that a new prime minister had substantially improved conditions in Ethiopia. The IJ therefore found that Hussen had failed to show that he was eligible for relief. He did, however, grant Hussen the relief of voluntary departure on the condition that he post a $500 bond.

Hussen appealed to the BIA, and it affirmed, explaining that it found no clear error in the IJ's adverse credibility finding. In particular, the BIA found no clear error in the IJ's finding implausible Hussen's testimony that, "despite the fact he had been arrested for political activity in 2005, he was hired for a government position . . . and then permitted to

7

leave Ethiopia for good." The BIA also upheld the IJ's finding that it was implausible that Hussen would have been arrested for attending an event that the government had expressly permitted. The BIA then examined the corroborating evidence and found that it did not rehabilitate Hussen's "incredible testimony." Finally, the BIA concluded that Hussen was not "'more likely than not' to be tortured in Ethiopia" and thus had failed to satisfy his burden under CAT. Because Hussen had failed to pay the $500 bond, the BIA ordered him removed to Ethiopia.

From the BIA's order dated December 19, 2022, Hussen filed this petition for review.

We review the agency's findings of fact for substantial evidence, taking them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Hui Pan v. Holder*, 737 F.3d 921, 926 (4th Cir. 2013). And such findings of fact include adverse credibility determinations, which we will uphold if the record contains "more than a mere scintilla" of supportive evidence. *Herrera-Alcala v. Garland*, 39 F.4th 233, 245 (4th Cir. 2022) (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). An applicant's testimony may be found not credible based on, among other considerations, its inherent implausibility. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). When reviewing an adverse credibility finding, we "assess whether the IJ or BIA identified non-speculative, specific, cogent reasons" supporting it. *Hui Pan*, 737 F.3d at 928 (cleaned up).

Here, the IJ provided, and the BIA adopted, specific and cogent reasons for finding Hussen's testimony not credible. The IJ found certain portions of Hussen's testimony

8

vague and other portions inherently implausible. In particular, the IJ found implausible the notion that Hussen would be targeted for arrest one day after attending as a casual participant a large, government-sanctioned protest, when there was no indication in the record that the protest's organizers — or, indeed, anyone known to Hussen — had also been arrested after the protest. He also found it implausible that the government that had allegedly persecuted Hussen had hired him to a government ministry and then permitted him to leave the country. And the BIA affirmed these findings. These are just the sort of specific, cogent reasons that adequately support an adverse credibility determination in light of the deference we afford an agency's findings of fact. Accordingly, we deny Hussen's first petition, No. 23-1047.

## II. Petition No. 23-2197

While petition No. 23-1047 was pending before us, Hussen married Asiya Houndito, a U.S. citizen, and Houndito promptly filed an I-130 application for an immigrant visa on Hussen's behalf. Hussen then filed a motion with the BIA to reopen his removal proceedings to pursue an adjustment of status should the I-130 visa petition be approved. An adjustment of status would allow Hussen to remain in the United States despite the BIA's denial of his application for asylum, withholding of removal, and CAT relief.

Relying on *Matter of Velarde-Pacheco*, 23 I. & N. Dec. 253 (B.I.A. 2002), which sets forth the standard for reopening proceedings in the circumstances presented, Hussen submitted affidavits in support of his motion from Houndito and himself, in which they

9

described the circumstances of their marriage. Hussen stated that he met Houndito through "a mutual acquaintance" who knew her family and was "well aware that [Hussen] was interested in finding a wife and starting a family." Hussen also described how he and Houndito spoke initially by telephone in late October 2022 and regularly thereafter and how they learned from these conversations that they "had some important things in common." They learned, for example, that each belonged to the same Ethiopian ethnic group, spoke the same language, and was Muslim. After about a month of phone conversations, Hussen drove from Virginia to Columbus, Ohio, where Houndito was attending nursing school, to visit Houndito and meet her family. And following that visit, Hussen decided that he wanted to marry Houndito.

Hussen and Houndito continued communicating regularly thereafter, and Hussen again visited Houndito in Columbus in February 2023, when the two became engaged. Hussen explained that in their culture, the two actually "took a comparatively long[] time" to date before becoming engaged; "it is not normal for people to date for an extended period before marriage."

During this period, Houndito's father was visiting family in Ethiopia. When he received news of the engagement, Houndito's father and other relatives hosted several of Hussen's family members, including his father, at Houndito's grandparents' home. This meeting was an important prerequisite to the couple's marriage, as Ethiopian custom dictated that a couple must receive the permission of their elders before marrying. At the meeting, Hussen's family members described Hussen as a hard worker who was "family

10

oriented" and committed in "his faith to Allah," and Houndito's father gave his approval for the marriage.

Thereafter, Hussen and Houndito obtained a marriage license, and they married on March 4, 2023, at a mosque in Columbus, Ohio, with friends and family in attendance. During the marriage ceremony, the couple entered into an Islamic marriage contract, and Houndito's father, having returned early from Ethiopia to attend the wedding, then hosted a reception at his home. Two of Hussen's sisters, his brother-in-law, and the friend who introduced Hussen and Houndito drove together from the Washington, D.C. area to attend the wedding. Another of Hussen's friends traveled from Chicago for the event. On the day of the wedding, Hussen's father also hosted family members for lunch at his home in Ethiopia to celebrate the couple's union.

After the wedding, Hussen and Houndito flew to Miami, Florida, for a honeymoon. Houndito then moved from Ohio to Alexandria, Virginia, where she joined Hussen, and the couple leased an apartment together. Houndito stated that she intended to apply to nursing schools in the Washington, D.C. area to complete her training, and Hussen and Houndito stated that they were eager to start a family soon. Both also stated that they were planning to hold a large traditional wedding ceremony on July 15, 2023, and were hopeful that Hussen's mother would be able to travel from Ethiopia to attend.

In addition to these two affidavits, Hussen submitted seven affidavits of family members and friends, many of whom had traveled great distances to attend the wedding, stating that the family members and friends had witnessed both the development of Hussen and Houndito's relationship and the wedding. Hussen also submitted a copy of the signed

11

marriage certificate and Islamic marriage contract, with the latter obligating Houndito's family to pay a $10,000 dowry; numerous photographs depicting the wedding ceremony and honeymoon; a receipt for payment of more than $4,000 for his purchase of a diamond ring; copies of two plane tickets and a receipt showing that the couple paid more than $300 to fly to Miami for their honeymoon; a receipt showing that the couple paid more than $1,400 to place a four-night reservation at a hotel in Miami; a copy of a lease agreement they signed for an apartment in Virginia, dated three days prior to the wedding; a copy of an automobile insurance card that named both Hussen and Houndito as the policy's insured; and finally, photos that depicted Hussen's family meeting Houndito's family in Ethiopia and the celebration that Hussen's father hosted in Ethiopia to celebrate their marriage.

The BIA denied Hussen's motion to reopen, stating that the standard to reopen proceedings to seek adjustment of status based on a marriage entered after the commencement of removal proceedings required Hussen to submit "clear and convincing evidence of the bona fides of the marriage." (First citing *Matter of Velarde*, 23 I. & N. Dec. 253; and then citing 8 C.F.R. § 204.2(a)(1)(iii)(B)). While the BIA acknowledged that Hussen had attached photographs of the wedding, honeymoon, and gathering between families, as well as affidavits from friends and family and the couple's lease agreement, it concluded that this was only "some evidence of the bona fides of [the] marriage" but was "insufficient to establish the bona fides of his marriage by clear and convincing evidence."

From the BIA's order, Hussen filed his second petition for review, No. 23-2197, which we consolidated with his first petition.

12

In this petition, Hussen contends (1) that the BIA, misconstruing *Matter of Velarde*, applied the wrong legal standard to determine whether to reopen the proceedings, and (2) that he amply satisfied the proper standard for reopening the proceedings with the evidence that he presented.

As background, a U.S. citizen may request an immigrant visa on behalf of her spouse, which can, in turn, support the spouse's application for adjustment of status. *See* 8 U.S.C. § 1255. That privilege can, however, incentivize fraudulent marriages. To deter such fraud, Congress initially adopted a categorical bar to an adjustment of status based on a marriage that was entered into *after removal proceedings had commenced*. Immigration Marriage Fraud Amendments of 1986, Pub. L. No. 99-639, § 5, 100 Stat. 3537, 3543 (codified as amended at 8 U.S.C. § 1255(e)(1)–(2)). While this bar was "exceedingly effective" at deterring fraud "because *all* marriages entered into during the course of proceedings were included in its sweep," it also precluded adjustment for many respondents in good-faith marriages, including some with children, and thus resulted in substantial hardship for many U.S. citizens and their families. *Matter of Velarde*, 23 I. & N. Dec. at 258 (Holmes, Board Member, concurring).

Thus, Congress amended the Act to permit respondents to seek adjustment of status based on marriages they had entered into during removal proceedings if they were able to show the bona fides of the marriage. Immigration Act of 1990, Pub. L. No. 101-649, § 702, 104 Stat. 4978, 5086 (codified as amended at 8 U.S.C. § 1255(e)(3)). After that amendment, a respondent could seek adjustment of status if the respondent "establishe[d] by clear and convincing evidence to the satisfaction of the Attorney General that the

13

marriage was entered into in good faith" and not "for the purpose of procuring the alien's admission as an immigrant." 8 U.S.C. § 1255(e)(3). This standard, as the House Conference Report explained, promoted Congress's goal of providing respondents with an opportunity to show the bona fides of a marriage they had entered during removal proceedings. H.R. Rep. No. 101-955, at 128 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 6784, 6793; *see also Matter of Velarde*, 23 I. & N. Dec. at 257.

Regulations promulgated to implement the 1990 amendment listed examples of the evidence that might suffice to establish the bona fides of a marriage, including:

> (1) Documentation showing joint ownership of property; (2) Lease showing joint tenancy of a common residence; (3) Documentation showing commingling of financial resources; (4) Birth certificate(s) of child(ren) born to the petitioner and beneficiary; (5) Affidavits of third parties having knowledge of the bona fides of the marital relationship . . . ; or (6) Any other documentation which is relevant to establish the marriage was not entered into in order to evade the immigration laws of the United States.

8 C.F.R. § 204.2(a)(1)(iii)(B). Under these regulations, a respondent's essential task was to demonstrate that he and his spouse "intended to establish a life together at the time they were married." *Matter of Laureano*, 19 I. & N. Dec. 1, 2–3 (B.I.A. 1983); Petition to Classify Alien as Immediate Relative of a United States Citizen, 57 Fed. Reg. 41053-01, 41055 (Sept. 9, 1992).

In this legal context, Hussen filed a motion to reopen his proceedings after the removal order had been entered.

Stated broadly, a motion to reopen seeks permission to present new evidence material to a respondent's immigration proceeding after a final decision in that proceeding has already been made. *See* 8 C.F.R. § 1003.2(c). And reopening is considered an

14

"important safeguard intended to ensure a proper and lawful disposition of immigration proceedings." *Kucana v. Holder*, 558 U.S. 233, 242 (2010) (cleaned up).  This form of procedural relief was originally a creature of judicial innovation, with roots in cases from the early twentieth century that addressed, among other things, aliens seeking to introduce evidence that they had married a U.S. citizen.  *Dada v. Mukasey*, 554 U.S. 1, 12 (2008) (citing *Ex parte Chan Shee*, 236 F. 579 (N.D. Cal. 1916)).  Today, motions to reopen are governed by statute and regulation.  *See, e.g.*, 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 1003.2(c).

The requirements for reopening in the circumstances presented here are set forth in *Matter of Velarde*, where the BIA stated that it may grant a motion to reopen when:

> (1) the motion is timely filed; (2) the motion is not numerically barred by the regulations; (3) the motion is not barred by *Matter of Shaar*, or on any other procedural grounds; (4) the motion presents clear and convincing evidence indicating a strong likelihood that the respondent's marriage is bona fide; and (5) the Service either does not oppose the motion or bases its opposition solely on *Matter of Arthur*.

23 I. & N. Dec. at 256 (citations omitted).  The BIA's decision to reopen, however, remains discretionary.  *Id.* at 256–57.

Thus, we review the BIA's decision to deny a motion to reopen for abuse of discretion.  *Garcia Hernandez v. Garland*, 27 F.4th 263, 266 (4th Cir. 2022).  The BIA abuses its discretion when, among other things, it acts "contrary to law."  *Mouns v. Garland*, 113 F.4th 399, 402 (4th Cir. 2024) (quoting *Narine v. Holder*, 559 F.3d 246, 249 (4th Cir. 2009)).  Stated differently, a legal error necessarily constitutes an abuse of discretion.  *Portillo Flores v. Garland*, 3 F.4th 615, 635 (4th Cir. 2021) (en banc).  And as a corollary, we may vacate a decision of the BIA if it "fails to properly apply its own

15

precedent." *Annor v. Garland*, 95 F.4th 820, 826 (4th Cir. 2024); *accord Mouns*, 113 F.4th at 414 (holding that the BIA abused its discretion "by flouting its own precedents").

In this petition, the only requirement under *Matter of Velarde* that is at issue is factor number (4), under which a respondent must "present[] clear and convincing evidence indicating *a strong likelihood* that the respondent's marriage is bona fide." 23 I. & N. Dec. at 256 (emphasis added). Under that requirement, a respondent need only make out a "prima facie" showing that he can satisfy the requirements of the Immigration Marriage Fraud Amendments of 1986, as amended by the Immigration Act of 1990. *Id.* at 257; *id.* at 262 (Rosenberg, Board Member, concurring) ("By finding prima facie eligibility, we are deciding only that there is a reasonable likelihood that the statutory requirements for the relief sought will be satisfied"); *see also INS v. Abudu*, 485 U.S. 94, 104 (1988) (explaining that the BIA may deny a motion to reopen when the respondent "has not established a prima facie case for the underlying substantive relief sought").

In short, *Matter of Velarde* does not require that the petitioner establish by clear and convincing evidence that his marriage was *in fact* bona fide; it requires only that the respondent establish a "*strong likelihood*" that he would be able to demonstrate that his marriage was bona fide should the BIA grant his motion to reopen. Despite this prima facie standard, the BIA in this case required that Hussen prove that his marriage was *indeed* bona fide in his motion to reopen. Specifically, the BIA stated the standard as follows: "A timely motion to reopen to apply for adjustment of status based on a pending marriage-based visa petition may be granted if the respondent was admitted into the United States and submits *clear and convincing evidence of the bona fides of the marriage*." (Emphasis

16

added).  And, after reviewing the evidence presented, the BIA found — again, applying the same standard — that Hussen's evidence was insufficient because it did not establish "the bona fides of his marriage by clear and convincing evidence."

The BIA's articulation and application of the standard were legal error.  At the motion to reopen stage, Hussen needed only to have demonstrated "a strong likelihood" that he could show, by clear and convincing evidence, that his marriage was bona fide. Yet, the BIA held Hussen to the ultimate burden that he would have to satisfy were it to grant his motion to reopen.

Because the BIA applied the wrong standard for deciding Hussen's motion to reopen, we grant his petition, vacate the BIA's order denying Hussen's motion to reopen, and remand for application of the correct standard.  In view of this relief, we do not address Hussen's separate argument that his evidence was sufficient to support his motion to reopen under the correct standard, although his evidence does appear to have been quite fulsome.

## III.  Petition No. 24-1257

Again, while both petitions, Nos. 23-1047 and 23-2197, were pending before us, Hussen filed another motion with the BIA for reconsideration and to reopen to provide additional evidence to support an adjustment of status.  He attached evidence showing that Houndito was pregnant; that he and Houndito were living together in Alexandria; and that they shared a joint bank account.  While he acknowledged that respondents are generally limited to a single motion to reopen, he pointed to BIA decisions indicating that the BIA "retains the authority to grant a sua sponte reopening in 'truly exceptional situations'"

17

(quoting *Matter of G-D-*, 22 I. & N. Dec. 1132, 1133–34 (B.I.A. 1999)), and he requested that the BIA do so in his case.

The BIA again denied Hussen's motion. It stated that it was adhering to its earlier finding that the evidence was insufficient to support Hussen's motion to reopen. And as to the second motion to reopen, the BIA concluded that the motion was barred by regulations permitting only one motion to reopen. The BIA also declined Hussen's request that it sua sponte reopen his proceedings. From the BIA's order dated March 6, 2024, Hussen filed this third petition for review, No. 24-1257, which we consolidated with his first two.

In view of the relief we grant on Hussen's second petition, No. 23-2197, vacating and remanding to the BIA for further proceedings, we conclude that this third petition for review is now moot.

*        *        *

In sum, we deny Hussen's first petition for review, No. 23-1047; we grant his second petition for review, No. 23-2197, vacate the BIA's order, and remand for further proceedings; and we deny as moot his third petition for review, No. 24-1257.

IT IS SO ORDERED.

18