**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1653**

YANI MULYANI; DIDIN WAHIDIN,

                Petitioners,

        v.

ERIC H. HOLDER, JR., Attorney General,

                Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued:  September 17, 2014        Decided:  November 14, 2014

Before NIEMEYER, DUNCAN, and THACKER, Circuit Judges.

Petition for review denied by published opinion.  Judge Thacker
wrote the opinion, in which Judge Niemeyer and Judge Duncan
joined.

**ARGUED:** H. Glenn Fogle, Jr., THE FOGLE LAW FIRM, LLC, Atlanta,
Georgia, for Petitioners.  Gregory Michael Kelch, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON
BRIEF:** Stuart F. Delery, Assistant Attorney General, Linda S.
Wernery, Assistant Director, Office of Immigration Litigation,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Respondent.

THACKER, Circuit Judge:

Yani Mulyani ("Mulyani") is a native of Indonesia. She petitions this court for review of a Board of Immigration Appeals ("BIA") decision denying her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").[1] Her petition for review raises three arguments. First, Mulyani asserts that the statutory time bar, 8 U.S.C. § 1158(a)(2)(B), does not preclude her application for asylum. Second, she disputes the BIA's determination that her claims for asylum and withholding of removal cannot proceed because she failed to show that the Indonesian government was unwilling or unable to protect her. Finally, Mulyani challenges the BIA's conclusion that CAT relief is unavailable because she has not shown that, upon removal, she would likely endure torture by or with the approval or acquiescence of the Indonesian government.

We do not reach Mulyani's first argument, as we lack jurisdiction to decide whether she qualifies for an exception to the statutory time bar. We reject her remaining arguments

---

[1] Mulyani's husband, Didin Wahidin, is also a petitioner in this case. However, because he seeks relief solely as a derivative beneficiary on his wife's application for asylum and withholding of removal, his claims rise and fall with hers. Accordingly, our opinion in this case focuses primarily on Mulyani.

because substantial evidence supports the BIA's determinations. Therefore, Mulyani's petition is denied.

## I.

Mulyani grew up a Christian in Indonesia, a majority-Muslim country. Her parents were converts to the Christian faith and had her baptized when she was four years old. For years, the family attended church every Sunday. To this day, Mulyani's parents and siblings continue to live in Indonesia and remain practicing Christians.

Mulyani's husband and co-petitioner, Didin Wahidin, is a Muslim. He prays at home but does not attend a mosque. Since arriving in the United States, Mulyani has practiced her faith in a similar fashion, worshipping exclusively in the home.

Mulyani and Wahidin came to the United States on vacation in September 2000. Instead of returning to Indonesia when their vacation ended, they chose to remain in the United States indefinitely. Mulyani asserts that she would suffer religious persecution if forced to return to Indonesia, having endured several instances of religiously motivated violence there during her youth. Her application for relief from removal recounts four such incidents.

The first of those incidents occurred in 1991, when Mulyani was 16 years old. A group of about ten students attacked her at a bus stop. The students hit and kicked her,

3

and one struck her with a metal rod. Mulyani suffered a broken left arm. Though she told her parents and her pastor about the beating, she did not report the incident to police, purportedly because she believed the police would not care about her because she was a Christian.

A few years later, when Mulyani was in college, she and a female companion were accosted on their way home from a prayer meeting at a friend's residence. Mulyani was carrying a bible at the time. The assailants, three men she did not know, chased the two young women and called them names like "nasty Christian" and "slutty Christian." J.A. 140.[2] The men grabbed Mulyani and held her hands behind her back. One man put his penis on her and tried to rape her. The assailants fled when someone across the street yelled "oy, oy." Id. at 142. As before, Mulyani did not report the incident to the police.

Later, in 1998, Mulyani and two other people were walking through downtown Majalengka in search of a lunch spot when they encountered what she described as a large crowd of "radical" Muslims staging an anti-Christian protest. J.A. 152. One protestor pointed at Mulyani and said, "Christian, Christian, burn the Christian." Id. at 153. Roughly 20 or 30

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

protestors attacked Mulyani.  They hit and kicked her and stuffed a handkerchief in her mouth.  One man snatched a hot skewer from a street vendor and pressed it to her stomach.  A police siren prompted the assailants to release her and flee the scene.  Once again, Mulyani did not report the incident to the police.

The final incident occurred shortly after the protest. According to Mulyani, a group of between four and eight "radical" Muslims gathered outside her parents' house at night. J.A. 156, 294.  They banged on the door and windows and threatened to burn the house down if the occupants did not come out.  Someone threw a Molotov cocktail through one of the windows, but the bomb did not explode.  Mulyani says she believes the group targeted the house because her family is Christian.

Mulyani remained in Indonesia for approximately two years after the last of these incidents.  In January 2000, she and Wahidin married.  The couple traveled to the United States on September 3, 2000, to vacation in Los Angeles and Las Vegas. Mulyani had a tourist visa and was authorized to remain in the United States until March 2, 2001.  After about two weeks of sightseeing, the couple headed east to visit a friend in Wisconsin.  While there, Mulyani says, "I realized and I observed that in [the] United States, they . . . have freedom of

religion.  They don't care if you're Christian or a Muslim."
J.A. 162.  For this reason, she says, she and her husband
decided to stay in America.

In 2001, the couple responded to a magazine
advertisement for an agency called the Chinese Indonesian
American Society ("CIAS"), which was offering to help people
obtain a green card or work permit.  Hoping to acquire work
permits, they agreed to send CIAS money and copies of certain
personal records.  "[T]hey sent us back blank pages telling us
where to sign these papers," Mulyani later recalled.  "We did
and sent them back, and then we received our working permits."
J.A. 295.  Although she says she did not know what she was
signing, one of the documents was, in fact, an application for
asylum and withholding of removal.  CIAS filed the application
on Mulyani's behalf in June 2002.[3]

Mulyani says she did not then know what asylum was.
She says she did not learn about this form of protection -- nor
that CIAS had already sought it for her -- until late 2004 or
early 2005, when she hired an attorney to renew her work permit.
It was during the course of these discussions with the attorney,

---

[3] A 2004 federal investigation implicated CIAS and its founder, Hans Gouw, in an asylum fraud scheme. See Loren Ryter, Indonesians in Asylum, in Identifying with Freedom: Indonesia After Suharto 125, 131 (Tony Day ed. 2007).

she says, that she realized she might qualify for asylum and decided she wanted to pursue it. She failed to take action, though, and in September 2008 the Department of Homeland Security initiated removal proceedings against Mulyani and Wahidin.

Both Mulyani and her husband conceded removability under section 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), which provides that any alien unlawfully present in the United States is deportable. See 8 U.S.C. § 1227(a)(1)(B). Mulyani sought relief in the form of asylum, withholding of removal, and withholding pursuant to the CAT. In support of her claims, she submitted a number of country reports and online articles indicating that the Indonesian government was indifferent, if not hostile, to the rights of Christians. The documents included a 2008 Department of State report observing that the Indonesian government sometimes "tolerated discrimination against and the abuse of religious groups by private actors and often failed to punish perpetrators." J.A. 506. This same report, however, also says that the Indonesian government operates programs to replace damaged churches and ease religious tension, and that the government has successfully tried and convicted numerous terrorists believed to have committed acts of interreligious violence.

7

Following a hearing, an immigration judge ("IJ") denied all requested relief. The IJ first determined that Mulyani's application for asylum was untimely under 8 U.S.C. § 1158(a)(2)(B) and therefore barred. With regard to the application for withholding of removal, the IJ found that the harm Mulyani experienced during her youth in Indonesia rose to the level of persecution. The IJ also acknowledged that the evidence permits a "reasonable inference" that this harm was on account of her Christian faith. J.A. 61. Nevertheless, the IJ denied the request for withholding of removal because Mulyani had not established that the Indonesian government was unable or unwilling to control her persecutors. The IJ also denied relief under the CAT, finding that Mulyani had failed to demonstrate that, if returned to Indonesia, she would likely "be tortured by, or at the instigation of, or with the consent or acquiescence of, a public official." Id. at 65.

On appeal, the BIA took no position as to whether Mulyani's application for asylum was time-barred, but it concluded that her claims for asylum and withholding of removal fail regardless because she had not established that the Indonesian government was unwilling or unable to protect her. The agency also accepted the IJ's determination that Mulyani did not merit CAT relief because she "has not shown that it is more likely than not that she would be tortured by or with the

8

approval or acquiescence of the government of Indonesia." J.A. 4. Accordingly, the BIA dismissed the appeal.

## II.

## A.

Mulyani first challenges the IJ's determination that her asylum application was untimely and therefore statutorily barred.

To apply for asylum, an alien must demonstrate "by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). Mulyani's 2002 application came too late to satisfy this requirement. Accordingly, to obtain relief, she must prove "[t]o the satisfaction of the asylum officer, the immigration judge, or the Board that . . . she qualifies for an exception to the 1-year deadline." 8 C.F.R. § 1208.4(a)(2)(i).

Mulyani asserts that she qualifies for the "extraordinary circumstances" exception to the one-year time limit. See 8 U.S.C. § 1158(a)(2)(D). This provision permits an alien to bring an untimely application if she "demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing." Id. Mulyani's argument, which the IJ

9

rejected, is that her failure to file within the one-year time limit should be excused because CIAS neglected to tell her about asylum before the filing deadline expired. We conclude that we lack jurisdiction to consider this claim, both because the BIA took no position on whether the statutory time limit bars her application and because Congress has expressly restricted our power to review agency decisions involving the time bar.

1.

By law, our power to review an order of removal is limited to the "final" order. 8 U.S.C. § 1252(a)(1); Martinez v. Holder, 740 F.3d 902, 908 n.1 (4th Cir. 2014). An order does not become final until "'all administrative remedies'" have been exhausted. Gandziami-Mickhou v. Gonzales, 445 F.3d 351, 359 n.2 (4th Cir. 2006) (quoting § 1252(d)(1)). Thus, as a general matter, final orders in removal proceedings come not from the IJ, but "from the BIA, the highest administrative tribunal." Martinez, 740 F.3d at 908 n.1 (internal quotation marks omitted).

This rule is not without exceptions. For instance, when the BIA issues an order, without opinion, affirming an IJ's decision and endorsing that decision as "the final agency determination," 8 C.F.R. § 1003.1(e)(4)(ii), we will "treat the reasoning of the IJ Order as that of the BIA." Haoua v. Gonzales, 472 F.3d 227, 231 (4th Cir. 2007).

10

In other cases, such as the instant one, the BIA may issue a brief order affirming, modifying, or reversing an immigration judge's decision. See 8 C.F.R. § 1003.1(e)(5). Under these circumstances, where the BIA has "essentially adopted the IJ's opinion while adding some of its own reasoning," the court may review both decisions. Thu v. Holder, 596 F.3d 994, 998 (8th Cir. 2010) (internal quotation marks omitted); see Martinez, 740 F.3d at 908. We have noted, though, that review of an IJ decision is permissible only to the extent that the BIA adopted it. See Martinez, 740 F.3d at 908 n.1 ("[W]here the BIA issues an opinion without adopting the IJ's opinion in whole or in part, this Court can only review the BIA's opinion.").

Here, the BIA expressly stated that it was "not finding that [Mulyani] has successfully established an exception to the 1 year filing deadline." J.A. 3. Instead, its decision "assume[d] arguendo" that her application was timely, and it concluded that her claims failed on the merits, regardless. Id. In doing so, the BIA excluded the timeliness issue from the final order of removal, leaving this court without power to consider the matter in our review.

11

2.

That is not to say that we would have had the power to review the timeliness issue if the BIA had ruled on it. In fact, we would not. Congress restricted our authority in 8 U.S.C. § 1158(a)(3). This provision states, "No court shall have jurisdiction to review any determination of the Attorney General under [8 U.S.C. § 1158(a)(2)]," a subsection that includes both the time limit and the exception for extraordinary circumstances. 8 U.S.C. § 1158(a)(3). Plainly, judicial review of the IJ's timeliness holding is unavailable under this provision. See Gomis v. Holder, 571 F.3d 353, 358-59 (4th Cir. 2009) (holding that, "under the express language of § 1158(a)(3)," we lacked jurisdiction to review an IJ's determination that an asylum applicant "had not demonstrated changed or extraordinary circumstances to excuse her untimely filing").

Our power to review an IJ's determination would survive the limitation in § 1158(a)(3) only if the appeal presented a constitutional claim or question of law. See 8 U.S.C. § 1252(a)(2)(D) (providing that statutory limitations on judicial review in certain immigration cases "shall [not] be construed as precluding review of constitutional claims or questions of law raised upon a petition for review"); Vasile v.

12

<u>Gonzales</u>, 417 F.3d 766, 768 (7th Cir. 2005). Mulyani's appeal, however, presents no such claim or question.

BIA determinations ordinarily reviewable under the substantial evidence standard are "necessarily factual in nature, and therefore beyond our jurisdiction to review." <u>Saintha v. Mukasey</u>, 516 F.3d 243, 249 (4th Cir. 2008); <u>see</u> <u>Higuit v. Gonzales</u>, 433 F.3d 417, 420 (4th Cir. 2006) ("We are not free to convert every immigration case into a question of law, and thereby undermine Congress's decision to grant limited jurisdiction over matters committed in the first instance to the sound discretion of the Executive."). In <u>Gomis v. Holder</u>, we joined the majority of federal circuit courts in concluding that 8 U.S.C. § 1252(a)(2)(D) does not confer appellate jurisdiction to consider an applicant's claims of changed or extraordinary circumstances. 571 F.3d at 358. That being so, we proceed no further on this question and turn instead to Mulyani's other arguments.

B.

Mulyani next challenges the BIA's conclusion that she failed to meet her burden of proof for asylum and withholding of removal. She contends that the evidence proves the Indonesian government would be unwilling or unable to protect her from religious persecution, and that the BIA's determination to the contrary was in error. We disagree.

13

A BIA decision granting or denying asylum under 8 U.S.C. § 1158(a) "shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). We may not disturb the BIA's determinations on asylum eligibility so long as those determinations "are supported by reasonable, substantial, and probative evidence on the record considered as a whole." Tassi v. Holder, 660 F.3d 710, 719 (4th Cir. 2011). While we review the BIA's legal conclusions de novo, our standard of review of the agency's factual findings is "narrow and deferential." Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011). We accept the agency's factual findings unless "any reasonable adjudicator would be compelled to conclude to the contrary." § 1252(b)(4)(B).

The scope of our review of a final order denying withholding of removal is likewise narrow. See Hui Pan v. Holder, 737 F.3d 921, 926 (4th Cir. 2013). Where, as here, the BIA concludes that the applicant has not met her burden of proof, "we will affirm the BIA's determination if it is supported by substantial evidence on the record considered as a whole." Niang v. Gonzales, 492 F.3d 505, 510 (4th Cir. 2007). Even if the record "plausibly could support two results: the one the IJ chose and the one [the petitioner] advances, reversal is only appropriate where the court find[s] that the evidence not

14

only supports [the opposite] conclusion, but compels it." Id. at 511 (alterations and emphasis in original) (internal quotation marks omitted).

The BIA requires an applicant alleging past persecution to show that the harm was inflicted by the government or by others whom the government is unable or unwilling to control. See In re Acosta, 19 I. & N. Dec. 211, 222 (BIA 1985), overruled in part on other grounds by In re Mogharrabi, 19 I. & N. Dec. 439 (BIA 1987); see also Menjivar v. Gonzales, 416 F.3d 918, 921 (8th Cir. 2005). This requirement is not explicit in the INA. Rather, it derives from the board's interpretations of two words with profound significance in asylum law -- namely, "refugee" and "persecution."

To qualify for asylum, an applicant must prove that she meets the definition of a "refugee" under 8 U.S.C. § 1101(a)(42). The applicant makes this showing by demonstrating that "she has suffered from past persecution or that she has a well-founded fear of future persecution" on account of race, religion, nationality, membership in a particular social group, or political opinion. Mirisawo v. Holder, 599 F.3d 391, 396 (4th Cir. 2010). An applicant who establishes past persecution on the basis of a protected factor benefits from a rebuttable presumption that she has a well-

founded fear of future persecution. See 8 C.F.R. § 208.13(b)(1); Djadjou, 662 F.3d at 272.

Withholding of removal is also based on persecution but "'implicates a more demanding standard of proof.'" Lizama v. Holder, 629 F.3d 440, 446 n.3 (4th Cir. 2011) (quoting Mirisawo, 599 F.3d at 396). Necessarily, "an applicant who fails to meet the lower standard for showing eligibility for asylum will be unable to satisfy the higher standard for showing withholding of removal." Mirisawo, 599 F.3d at 396.

Persecution, for purposes of asylum and withholding of removal, "'involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee definition.'" Li v. Gonzales, 405 F.3d 171, 177 (4th Cir. 2005) (quoting Kondakova v. Ashcroft, 383 F.3d 792, 797 (8th Cir. 2004)). The term encompasses "'actions less severe than threats to life or freedom.'" Id. (quoting Dandan v. Ashcroft, 339 F.3d 567, 573 (7th Cir. 2003)). "[W]hen one who seeks asylum demonstrates that he has been severely physically abused or tortured, courts have not hesitated to characterize such treatment as persecution." Id.

Prior to the adoption of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, the BIA construed the term "persecution" to mean "either a threat to the life or freedom

16

of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive." Acosta, 19 I. & N. Dec. at 222. Employing this construction, the board declared that the "harm or suffering had to be inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." Id. Many of our sister courts agree that an applicant alleging past persecution must establish either that the government was responsible for the persecution or that it was unable or unwilling to control the persecutors.[4] See, e.g., Gathungu v. Holder, 725 F.3d 900, 906 (8th Cir. 2013); Henriquez-Rivas v. Holder, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc); Jorgji v.

---

[4] In Crespin-Valladares v. Holder, we recognized that persecution under the INA "encompasses harm inflicted by . . . an entity that the government cannot or will not control." 632 F.3d 117, 128 (4th Cir. 2011); see Soliman v. Holder, 373 F. App'x 384, 385 (4th Cir. 2010) (per curiam) (defining persecution as "'the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim.'" (quoting Khalili v. Holder, 557 F.3d 429, 436 (6th Cir. 2009))). Consistent with this understanding, we have upheld BIA decisions denying relief where the applicant failed to show that the government was unwilling or unable to protect against persecution. See, e.g., Ramos-Gonzalez v. Holder, 453 F. App'x 417, 419 (4th Cir. 2011) (per curiam) (denying a petition for review of an order denying an application for withholding of removal); Sydykov v. Gonzales, 127 F. App'x 100, 100-01 (4th Cir. 2005) (per curiam) (denying a petition for review of an order denying asylum, withholding of removal, and CAT relief).

17

Mukasey, 514 F.3d 53, 57 (1st Cir. 2008); Sukwanputra v. Gonzales, 434 F.3d 627, 637 (3d Cir. 2006).

Mulyani does not dispute the need to establish governmental unwillingness or inability to control private actors. She contends, rather, that she made the necessary showing -- i.e., that her testimony recounting the persecution she suffered in Indonesia, combined with the country reports and articles accompanying her application, sufficiently demonstrate that the government was unwilling or unable to protect her.

The record shows that Mulyani never notified the police or any other governmental authorities about the persecution she claims to have suffered. Mulyani's own testimony suggests, moreover, that her attackers did not consider themselves free to assault her with impunity. In one instance, the attackers fled when a man across the street yelled "oy, oy." J.A. 142-43. In another, the anti-Christian protesters ceased the assault and scattered when they heard police sirens. It would seem, then, that the very people persecuting Mulyani believed the government was indeed willing and able to crack down on interreligious violence.

Moreover, the BIA decision points to a 2008 Department of State report observing that the Indonesian government maintains programs to replace damaged churches and ease religious tension, and that the government has successfully

18

prosecuted perpetrators of religiously motivated violence. This, too, is probative evidence of the government's willingness and ability to fight religious persecution. See, e.g., Osuji v. Holder, 657 F.3d 719, 721-22 (8th Cir. 2011) (holding that an asylum applicant had failed to prove past persecution in light of a Department of State report on Nigeria suggesting that ethnic violence, while "all too common," was not condoned by the government).

Mulyani directs our attention to another portion of the Department of State report, zeroing in on its finding that "[i]n some cases the [Indonesian government] tolerated discrimination against and the abuse of religious groups by private actors and often failed to punish perpetrators." J.A. 506. She also cites a posting on a website for persecuted Christians, www.persecution.com.au, reporting that the "implementation of shari'a [in parts of Indonesia] severely disadvantages Christians and other non-Muslims, rendering them second-class citizens and inducing them to conform to Muslim expectations in dress, social behaviour, criminal punishment, and so on." Id. at 548.

These statements, without more, do not justify a reversal of the BIA inasmuch as we "are not considering the evidence in the first instance, but rather are reviewing the BIA decision under a highly deferential standard." Evelyne v.

19

<u>Holder</u>, 419 F. App'x 396, 400 (4th Cir. 2011). We must uphold the BIA's decision so long as it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." <u>Tassi</u>, 660 F.3d at 719. Here, we hold that substantial evidence supports the BIA's determination that Mulyani does not qualify as a "refugee," and that the accounts found in country reports and articles accompanying her application are insufficient to compel a contrary conclusion.

C.

Mulyani's final argument is that the BIA improperly denied her claim for relief under the CAT. As before, our standard of review is deferential to the BIA. We review a denial of relief under the CAT for substantial evidence. <u>See</u> <u>Lizama</u>, 629 F.3d at 449. "Under this standard, 'administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" <u>Suarez-Valenzuela v. Holder</u>, 714 F.3d 241, 245 (4th Cir. 2013) (quoting 8 U.S.C. § 1252(b)(4)(B)).

An applicant for withholding of removal under the CAT must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). The burden of proof rests with the applicant. <u>Id.</u> "For purposes of the CAT, torture includes only conduct 'by or at the instigation of or with the

20

consent or acquiescence of a public official or other person acting in an official capacity.'" Lizama, 629 F.3d at 449 (quoting 8 C.F.R. § 1208.18(a)(1)). "A public official acquiesces to torture if, 'prior to the activity constituting torture, [the official] ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity.'" Id. (alterations in original) (quoting 8 C.F.R. § 1208.18(a)(7)). The official or officials need not have actual knowledge of the torture; it is enough if they simply "turn a blind eye" to it. Suarez-Valenzuela, 714 F.3d at 245-47.

The IJ in this case found that Mulyani had failed to proffer any evidence that the Indonesian government knows her identity or would harm her because of her religion, and the BIA agreed with the IJ's conclusion. Mulyani, again, points to various country reports and news stories about conditions in Indonesia as proof of government consent or acquiescence. These reports have probative value. See Suarez-Valenzuela, 714 F.3d at 247. Indeed, we have said that it makes sense for the BIA to rely on State Department reports such as these because an inquiry into country conditions "is directly within the expertise of the Department of State." Quitanilla v. Holder, 758 F.3d 570, 574 n.6 (4th Cir. 2014) (internal quotation marks omitted). We have cautioned, though, that the BIA may not treat

such reports "'as Holy Writ' immune to contradiction." Ai Hua Chen v. Holder, 742 F.3d 171, 179 (4th Cir. 2014) (quoting Galina v. INS, 213 F.3d 955, 959 (7th Cir. 2000)); see Gonahasa v. U.S. INS, 181 F.3d 538, 542 (4th Cir. 1999) (recognizing that State Department reports "may be flawed"). In any event, our task at this juncture "is not to reweigh the evidence and determine which of the competing views is more compelling. It is instead to ensure that substantial evidence supports the BIA's judgment." Gonahasa, 181 F.3d at 542. None of the evidence that Mulyani presents in this appeal is sufficient to overcome our standard of review. See Mendez-Barrera v. Holder, 602 F.3d 21, 28 (1st Cir. 2010) ("The country conditions reports, standing alone, do not carry the day.").

## III.

Pursuant to the foregoing, we deny Mulyani's petition for review and affirm the BIA's order.

PETITION FOR REVIEW DENIED