**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1424**

OSCAR PACAS-RENDEROS,

Petitioner,

v.

JEFFERSON B. SESSIONS III, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 9, 2017                         Decided: June 26, 2017

Before NIEMEYER, WYNN, and HARRIS, Circuit Judges.

Petition for review denied by unpublished opinion. Judge Wynn wrote the opinion, in which Judge Niemeyer and Judge Harris joined.

**ARGUED:** Mariam Masumi, JOHNSON AND ASSOCIATES, P.C., Arlington, Virginia, for Petitioner. Alexander Jacob Lutz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Randall L. Johnson, JOHNSON AND ASSOCIATES, P.C., Arlington, Virginia, for Petitioner. Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Shelley R. Goad, Assistant Director, Elizabeth R. Chapman, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Petitioner Oscar Pacas-Renderos, a native and citizen of El Salvador, seeks review of an order by the Board of Immigration Appeals ("BIA") regarding his applications for withholding of removal under the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT"). The BIA adopted and affirmed a decision by an immigration judge finding (1) that Pacas-Renderos was not entitled to withholding of removal under the INA because he had not established that he had faced or was likely to face persecution in El Salvador because of any imputed anti-gang political opinion or his membership in a legally cognizable social group and (2) that Pacas-Renderos was not eligible for protection under the CAT. Finding no reversible error, we deny the petition for review.

I.

A.

Pacas-Renderos first entered the United States without authorization in 1989. In the nineteen years that followed his initial entry into the country, Pacas-Renderos was arrested multiple times and also charged with and convicted of a variety of offenses, including grand larceny and possession of a controlled substance. Pacas-Renderos remained in the United States until immigration officials deported him to El Salvador on September 25, 2008.

Three days after Pacas-Renderos was deported to El Salvador, two members of the gang Mara Salvatrucha, also known as "MS-13," came to Pacas-Renderos's home while he, his mother, and his cousin were preparing for dinner, and demanded money from him.

3

When Pacas-Renderos informed them that he did not have any money because he had just returned to El Salvador, the men asked him to join MS-13. Pacas-Renderos refused, explaining that he "d[id]n't associate with criminal activities" and "[was] not a violent person." J.A. 110. In response, one of the gang members said, "[K]ill that son-of-a-bitch," prompting the other gang member to strike Pacas-Renderos on the side of his face. J.A. 110.

Pacas-Renderos stumbled to the ground, at which point the gang members began kicking him. As the beating continued, additional MS-13 gang members arrived and joined the two men in striking Pacas-Renderos. Finally, one of the gang members hit Pacas-Renderos in the back of his head, causing Pacas-Renderos to fall unconscious to the ground. As he lay unconscious, the gang members continued to beat Pacas-Renderos, hitting him on his face, head, and body until they believed he had died.

The police—who had been called by Pacas-Renderos's neighbors—transported Pacas-Renderos to a nearby hospital. As a result of the attack, Pacas-Renderos sustained permanent scarring to his face and nose and impaired vision in his right eye. Fearing for his safety, Pacas-Renderos and his family stayed in the hospital overnight before leaving the next morning to stay with cousins in a different part of the country. Pacas-Renderos remained in El Salvador for approximately nine or ten days and re-entered the United States without authorization on or about November 5, 2008.

B.

In December 2012, authorities in Chesterfield County, Virginia, arrested Pacas-Renderos and charged him with, among other offenses, driving while impaired, identity

4

theft, and resisting arrest. Soon thereafter, on January 8, 2013, the U.S. Department of Homeland Security issued Pacas-Renderos a Notice of Intent/Decision to Reinstate Prior Order, recommending a reinstatement of his prior removal order.

Immigration officials subsequently attained custody of Pacas-Renderos, who—after initially expressing no fear of persecution or torture if returned to El Salvador—later claimed to fear returning to El Salvador due to his previous interactions with MS-13. After an asylum officer found that Pacas-Renderos did not have a reasonable fear of persecution or torture, Pacas-Renderos's matter was referred to an immigration judge for withholding-only proceedings on June 1, 2015. When Pacas-Renderos later filed applications for withholding of removal under the INA and the CAT, the immigration judge vacated the asylum officer's findings on July 8, 2015.

Pacas-Renderos appeared before the immigration judge for a withholding-only hearing on September 23, 2015. At the hearing, Pacas-Renderos testified as to his experience during his nine or ten days in El Salvador following his September 2008 deportation. Pacas-Renderos further testified that he believed the El Salvadoran police either feared MS-13 or were working with the gang because the police never took a report of the attack and told his mother, when she later inquired about the case, that they had not opened an investigation into the assault.

Pacas-Renderos also claimed that he believed the gang members still wanted to harm him and recounted specific threats and acts of violence MS-13 gang members had directed at him and his family—including the murders of two of his cousins by the gang earlier in 2015. And in concluding his direct testimony, Pacas-Renderos stated that

5

authorities had not made any arrests in connection with the alleged attack, and that he did not think the police would protect him from future torture by MS-13 if he were to return to El Salvador.

Pacas-Renderos's mother and brother also testified at the hearing. Contradicting her son, Pacas-Renderos's mother testified that she could not remember whether the police had taken a report of the attack from her at the hospital. And, when asked whether anyone in her family had looked to see if the police had a report, Pacas-Renderos's mother responded, "No, because when the police took us, it was just the two of us. I, I can't remember." J.A. 135. Additionally, although Pacas-Renderos's brother testified that the police never followed up on a report he made regarding a threat he received from MS-13 gang members relating to Pacas-Renderos, he later clarified that he never filed a formal complaint in connection with the incident.

On November 3, 2015, the immigration judge denied Pacas-Renderos's applications. In his decision, the immigration judge analyzed Pacas-Renderos's claims that he was persecuted on account of an imputed anti-gang political opinion and on account of his membership in two social groups: "perceived Americanized non-community members" and the Renderos family. In rejecting these claims, the immigration judge found that Pacas-Renderos failed to demonstrate a "nexus" between the "harm [he] suffered at the hands of MS-13 and his political opinion" or "his feared persecution and the particular social group of his nuclear family." J.A. 74–75. The immigration judge further found that Pacas-Renderos's proposed social group of "perceived Americanized non-community members" was not legally cognizable under

6

the INA because the terms of the group were not particularized or immutable. And finally, the immigration judge determined that Pacas-Renderos was not eligible for protection under the CAT because he failed to show that the El Salvadoran government would acquiesce in, or at least be "willfully blind" to, his torture by MS-13. J.A. 76–77 (internal quotation marks omitted). The immigration judge therefore denied Pacas-Renderos's applications for withholding of removal under the INA and the CAT, and ordered that Pacas-Renderos be removed to El Salvador.

Pacas-Renderos thereafter appealed the denial of his applications to the BIA, which dismissed his appeal on April 7, 2016. In adopting and affirming the decision of the immigration judge, the BIA noted the lack of record evidence supporting an inference that the gang would persecute Pacas-Renderos based upon an imputed anti-gang political opinion. In particular, the BIA observed that Pacas-Renderos "did not testify that he was politically active, or that he ever publicly expressed any anti-gang opinion." J.A. 3. The BIA therefore concluded that any harm resulting from a refusal to join a gang, "without more," would typically not be found to be motivated by a political opinion. J.A. 3.

The BIA also supplemented the immigration judge's decision denying Pacas-Renderos's claim for relief under the CAT. In particular, the BIA found that Pacas-Renderos failed to establish that an El Salvadoran government official would acquiesce or turn a blind eye to his torture, emphasizing the assistance Pacas-Renderos received from the police after his attack.

Following the dismissal of his appeal, Pacas-Renderos timely filed a petition for review in this Court.

II.

The courts of appeals have jurisdiction to review final orders of removal. 8 U.S.C. § 1252(a)(1). "The scope of our review of a final order of removal denying . . . withholding of removal is narrow." *Hui Pan v. Holder*, 737 F.3d 921, 926 (4th Cir. 2013) (alteration and internal quotation marks omitted). We must uphold the agency's decision unless it is "manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). We review the agency's legal conclusions de novo, *Lin v. Mukasey*, 517 F.3d 685, 691 (4th Cir. 2008), and its administrative findings of fact under a "substantial evidence" standard, *Hui Pan*, 737 F.3d at 926. Under the deferential "substantial evidence" standard, an agency's findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Hui Pan*, 737 F.3d at 926. This means that "[e]ven if the record plausibly could support two results: the one the [immigration judge] chose and the one [the petitioner] advances, reversal is only appropriate where the court find[s] that the evidence not only supports [the opposite] conclusion, but *compels* it." *Mulyani v. Holder*, 771 F.3d 190, 197 (4th Cir. 2014) (third, fourth, and fifth alterations in original) (internal quotation marks omitted).

Additionally, "[b]ecause the BIA adopted and affirmed the decision of the [immigration judge] but supplemented that decision with its own opinion, the factual findings and reasoning contained in both decisions are subject to judicial review." *Chen v. Holder*, 742 F.3d 171, 177 (4th Cir. 2014) (internal quotation marks omitted), *as amended* (May 30, 2014). With these standards in mind, we first consider whether the BIA erred in affirming and adopting the immigration judge's findings as to Pacas-

8

Renderos's withholding of removal claims under the INA before turning to his claim under the CAT.

## III.

To qualify for withholding of removal under the INA, an applicant "must establish that if []he is removed, there is a clear probability that [his] 'life or freedom would be threatened . . . because of [his] race, religion, nationality, membership in a particular social group, or political opinion." *Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010) (quoting 8 U.S.C. § 1231(b)(3)(A)); *see also* 8 C.F.R. § 208.16(b)(1)–(2). In order "[t]o establish clear probability, the [applicant] must prove it is more likely than not that [his] life or freedom would be threatened in the country of removal." *Tang v. Lynch*, 840 F.3d 176, 183 (4th Cir. 2016) (third alteration in original) (internal quotation marks omitted). The applicant therefore bears the burden of demonstrating "a 'clear probability of persecution,' and link[ing] that probability of persecution to one of the five grounds enumerated in the statute." *Singh v. Holder*, 699 F.3d 321, 327 (4th Cir. 2012) (quoting *INS v. Stevic*, 467 U.S. 407, 413 (1984)); *see also Lizama v. Holder*, 629 F.3d 440, 446 (4th Cir. 2011).

Before the immigration judge and the BIA, Pacas-Renderos maintained that he was previously persecuted and was likely to face future persecution upon return to El Salvador on account of (1) an anti-gang political opinion that MS-13 gang members imputed to him and (2) his membership in two social groups: (a) the Renderos family and (b) "perceived Americanized non-community members." The BIA agreed with the immigration judge's findings that Pacas-Renderos had failed to establish a nexus between

9

his persecution and either his imputed anti-gang political opinion or his membership in the Renderos family. The BIA also concluded that the immigration judge correctly determined that Pacas-Renderos's proposed "perceived Americanized non-community members" social group was not legally cognizable under the INA. Pacas-Renderos challenges each of these determinations, which we discuss in turn.

1.

We turn first to the question of whether Pacas-Renderos satisfied the statutory nexus requirement for withholding of removal regarding his alleged imputed anti-gang political opinion and his membership in the Renderos family. As set out above, an applicant for withholding of removal "must show a clear probability of persecution on account of a protected ground." *Djadjou v. Holder*, 662 F.3d 265, 272 (4th Cir. 2011) (internal quotation marks omitted); *see also Oliva v. Lynch*, 807 F.3d 53, 59 (4th Cir. 2015) ("An applicant must satisfy the nexus requirement by showing his past or threatened persecution was 'on account of' [a statutorily protected ground]." (quoting 8 U.S.C. § 1101(a)(42)(A))). "Persecution occurs 'on account of' a protected ground if that ground serves as 'at least one central reason for' the feared persecution." *Crespin-Valladares v. Holder*, 632 F.3d 117, 127 (4th Cir. 2011) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). Although "[t]he protected ground need *not* be the central reason or even a dominant central reason for persecution, . . . it must be more than an incidental, tangential, superficial, or subordinate reason." *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014) (internal quotation marks omitted).

10

We conclude that substantial evidence supports the immigration judge's and the BIA's determination that Pacas-Renderos failed to establish a nexus between his persecution and his alleged imputed anti-gang political opinion.* Pacas-Renderos maintains that he "reasonably demonstrate[d] that his persecutors were motivated by his imputed 'anti-gang' political opinion because the direct response to his statement that he would not join because of their activities was to 'kill that son-of-a-bitch.'" Pet'r's Br. at 18 (quoting A.R. 110). But the BIA and the immigration judge found as a matter of fact that the MS-13 gang members threatened Pacas-Renderos on account of his refusal to comply with the gang members' extortionate demands and recruitment efforts, and not on account of any imputed anti-gang political opinion. Although we may have reached a different conclusion had we assessed the evidence in the first instance, the absence of "evidence that the [gang] ever perceived [Pacas-Renderos] as holding any particular political opinion" provided a basis for a reasonable adjudicator to conclude that the gang members did not attack Pacas-Renderos because they believed he espoused an anti-gang political opinion. *Yi Ni v. Holder*, 613 F.3d 415, 428 (4th Cir. 2010) (finding petitioner, whose wife was forced to have an abortion, failed to satisfy nexus requirement where

---

* Pacas-Renderos also argues that the BIA erred in finding that he "could not demonstrate an anti-gang opinion in part because he testified that he was not politically active [and had not] 'publicly expressed' any anti-gang opinion," Pet'r's Br. at 18 (quoting A.R. 3), as it ignored "the 'imputed' part of his political opinion," Pet'r's Br. at 18. Contrary to Pacas-Renderos's reformulation of the BIA's decision in his case, however, the BIA did not ignore the possibility that MS-13 may have imputed a political opinion to him. Instead, the BIA recognized that "the evidence d[id] not show that the gangs would persecute [Pacas-Renderos] *based upon any real or imputed political opinion*." J.A. 3 (emphasis added).

11

there was no evidence the government perceived petitioner as holding a particular political opinion or that he was politically active by resisting population control policies).

Pacas-Renderos also contends that the BIA erred in adopting the immigration judge's finding that his membership in the Renderos family was not a central reason for his past or future persecution. In his brief, Pacas-Renderos concedes that the past persecution he suffered was not on account of his kinship ties. Rather, Pacas-Renderos maintains that the immigration judge failed to recognize that "one central reason for his *future* persecution is based on his kinship ties to his two cousins who were murdered months before" he appeared before the immigration judge. Pet'r's Br. at 12. With this in mind, Pacas-Renderos argues that the immigration judge "failed to consider whether the persecutors['] motives had evolved since the initial attack against [him]," and urges this Court to remand for the BIA to decide the issue in the first instance. Pet'r's Br. at 14. This, we decline to do.

Initially, we note that the immigration judge and the BIA considered whether Pacas-Renderos's membership in the Renderos family would be a central reason for his *future* persecution. In particular, the immigration judge noted that Pacas-Renderos "ha[d] not established that his membership in the Renderos family is 'at least one central reason' for the persecution he suffered *and fears suffering* if returned to El Salvador." J.A. 75 (emphasis added). Likewise, the BIA agreed with the immigration judge that Pacas-Renderos "ha[d] not demonstrated the required nexus between the harm he *fears* and his alleged particular social group." J.A. 3 (emphasis added). Thus, we conclude that the

12

immigration judge and the BIA considered and rejected Pacas-Renderos's argument as to future persecution based on his kinship ties.

Moreover, substantial evidence supports the agency's conclusion that Pacas-Renderos failed to establish a nexus between his persecution and his membership in the Renderos family. "To prove that persecution took place on account of family ties, an asylum applicant need not show that his family ties provide the central reason or even a dominant central reason for his persecution, [but] he must demonstrate that these ties are more than an incidental, tangential, superficial, or subordinate reason for his persecution." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) (alteration in original) (internal quotation marks omitted). At his hearing, Pacas-Renderos testified that one of his cousins was unintentionally killed by MS-13 gang members as he attempted to help another relative escape and elude the gang. And Pacas-Renderos also testified that MS-13 killed another of his cousins after members of the gang caught that cousin employing a helper on his farm who had been a former member of MS-13 and had tried to escape them. Under the deferential substantial evidence standard we are bound to apply, we conclude that the absence of any direct evidence establishing that MS-13 gang members associated Pacas-Renderos with his cousins—much less that they intended to persecute Pacas-Renderos because of his familial relationship to his cousins—provided an adequate basis for a reasonable adjudicator to deny Pacas-Renderos relief.

Because Pacas-Renderos "has provided no evidence that his . . . political beliefs were more than incidental or tangential to any part of the persecution he suffered," we conclude that the record evidence adequately supports the conclusion that Pacas-

13

Renderos's political opinion did not constitute a central reason for his persecution. *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 165 (4th Cir. 2009). And because Pacas-Renderos has failed to demonstrate that his persecutors were or are aware of his relationship to his cousins or that they would be motivated to persecute him based on his familial ties to them, we similarly conclude that substantial evidence supports the immigration judge's and the BIA's findings that Pacas-Renderos failed to establish a nexus between his persecution and family ties.

2.

We next turn to the issue of whether Pacas-Renderos's proposed group of "perceived Americanized non-community members" qualifies as a "particular social group." 8 U.S.C. § 1231(b)(3)(A). Whether a proposed social group is a "particular social group" under the INA is a question of law, which this Court reviews de novo. *Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir. 2014), *as revised* (Jan. 27, 2014). Because "[n]either the relevant statute nor its associated regulations specifically define the term 'particular social group,'" we afford *Chevron* deference to the BIA's reasonable interpretation of the term. *Lizama*, 629 F.3d at 446–47; *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Accordingly, under the BIA's precedential decisions, a "particular social group" is legally cognizable under the INA "if the group is: '(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.'" *Oliva*, 807 F.3d at 61 (quoting *Matter of M–E–V–G–*, 26 I. & N. Dec. 227, 237 (B.I.A. 2014)).

14

We conclude that the group, as proposed by Pacas-Renderos, fails to meet the required criteria for cognizability under the INA. In particular, "Americanization is not an immutable characteristic." *Lizama*, 629 F.3d at 447 (rejecting petitioner's "claims that his Americanized dress and speech distinguish him [because] such acquired traits are not 'beyond the power of [the petitioner] to change,' nor so fundamental to his conscience 'that it ought not be required to be changed'" (second alteration in original) (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 234 (B.I.A. 1985))). And Americanization and non-community member are "amorphous characteristics that neither 'provide an adequate benchmark for determining group membership,' nor embody concrete traits that would readily identify a person as possessing those characteristics." *Id.* (citation omitted) (quoting *In Re A–M–E– & J–G–U–*, 24 I. & N. Dec. 69, 76 (B.I.A. 2007)). "[P]eople's ideas of what those terms mean can vary," *id.* (internal quotation marks omitted) (quoting *Matter of S–E–G–,* 24 I. & N. Dec. 579, 585 (B.I.A. 2008)), and, as the immigration judge recognized, "[a] 'non-community member' could signify someone from a different neighborhood in the same town, someone from a different department of El Salvador, an individual from another country, or an individual of a different religion," J.A. 75; *see also Ahmed v. Holder*, 611 F.3d 90, 95 (1st Cir. 2010) (rejecting proposed social group where adjectives describing group "reflect[ed] matters of degree," "call[ed] for subjective value judgments," and were not "readily apparent nor susceptible to determination through objective means").

We similarly reject Pacas-Renderos's contention that the immigration judge erred in "split[ting] [Pacas-Renderos's] social group into two parts rather than reading them

15

together." Pet'r's Br. at 16. While it is true that the agency "commits legal error by splitting [an applicant's proposed] group in two and rejecting each part, rather than considering it as a whole," *Temu v. Holder*, 740 F.3d 887, 895 (4th Cir. 2014), the immigration judge did not divide Pacas-Renderos's proposed group into parts. Instead, the immigration judge found that Pacas-Renderos's "attempt to narrow the group by restricting it to non-community members d[id] not make the group cognizable," indicating that he in fact considered the proposed group as a whole. J.A. 75. We therefore decline to find such error on the part of the immigration judge.

Accordingly, because, "as a whole, the group described is not narrow or enduring enough to clearly delineate its membership or readily identify its members," we conclude that Pacas-Renderos's proposed group does not constitute a "particular social group" for purposes of the INA. *Lizama*, 629 F.3d at 448.

IV.

Pacas-Renderos's final argument is that the immigration judge and the BIA erred in denying his claim for protection under the CAT. "As before, our standard of review is deferential to the BIA. We review a denial of relief under the CAT for substantial evidence." *Mulyani*, 771 F.3d at 200.

An applicant for withholding of removal under the CAT must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "To constitute torture within the meaning of the CAT, the harm must be 'inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Singh*,

16

699 F.3d at 334 (quoting 8 C.F.R. § 1208.18(a)(1)). "A public official acquiesces to torture if, 'prior to the activity constituting torture, [the official] ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity.'" *Lizama*, 629 F.3d at 449 (alterations in original) (quoting 8 C.F.R. § 1208.18(a)(7)). Moreover, "[t]he official or officials need not have actual knowledge of the torture; it is enough if they simply turn a blind eye to it." *Mulyani*, 771 F.3d at 200 (internal quotation marks omitted).

The immigration judge found that "[a]lthough [Pacas-Renderos] ha[d] established a high likelihood of torture, he ha[d] not shown the government would acquiesce in his torture by gangs." J.A. 76. The immigration judge found, in particular, that "[Pacas-Renderos's] own experiences, as well as those of his family, d[id] not demonstrate government acquiescence." J.A. 77. On appeal, the BIA affirmed the immigration judge's finding and additionally concluded that Pacas-Renderos had failed to show "that government officials would turn a blind eye to his torture." J.A. 4.

We conclude that substantial evidence supports the agency's determination that Pacas-Renderos failed to establish that the government acquiesced in his torture or would do so in the future. As the immigration judge emphasized, the local police transported Pacas-Renderos to the hospital after he was attacked by MS-13 gang members, providing some evidence that the police would continue to come to Pacas-Renderos's aid. Although Pacas-Renderos claims that the police failed to investigate the attack, testimony by Pacas-Renderos and his mother regarding whether anyone tried to file a formal report of the attack with police or request an investigation was vague and inconsistent. In such

17

circumstances, we cannot say the record "compelled" the BIA and the immigration judge to conclude that the local government had acquiesced in the gang's attack on Pacas-Renderos.  8 U.S.C. § 1252(b)(4)(B).

Likewise, record evidence did not compel the BIA and the immigration judge to conclude that the government of El Salvador would acquiesce in Pacas-Renderos's torture.  Although country conditions evidence in the record identifies an ineffective police force and widespread corruption throughout El Salvador, the evidence does not establish that the El Salvadoran government would acquiesce to acts of torture against Pacas-Renderos by gang members.  On the contrary, the record contains evidence of the El Salvadoran government's affirmative efforts to combat gang violence, such as the president's recent public rejection of a "truce" between the gangs and the government and an "aggressive crackdown" on gang leaders in prison.  J.A. 324.  Because the record evidence does not compel the conclusion that either the local police or the El Salvadoran government would acquiesce to Pacas-Renderos's torture by MS-13 gang members, we must uphold the agency's decision to deny relief under the CAT.

V.

For the reasons stated herein, we deny Pacas-Renderos's petition for review.

*PETITION FOR REVIEW DENIED*

18