**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-2395**

EDER ENRIQUE ROMERO-DONADO,

        Petitioner,

    v.

JEFFERSON B. SESSIONS III, Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Submitted: January 23, 2018                 Decided: April 12, 2018

Before DUNCAN, KEENAN, and DIAZ, Circuit Judges.

Petition for review denied by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Duncan and Judge Keenan joined.

Randall L. Johnson, JOHNSON & ASSOCIATES, P.C., for Petitioner. Chad A. Readler, Acting Assistant Attorney General, Linda S. Wernery, Assistant Director, Gregory M. Kelch, Trial Attorney, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Petitioner Eder Enrique Romero-Donado, a native and citizen of El Salvador, seeks protection under the Convention Against Torture (the "CAT"). He argues that if he returns to El Salvador he will be tortured by MS-13 as punishment for leaving the gang in 2001. An immigration judge ultimately granted Romero's application, but the Board of Immigration Appeals reversed, adopting its own factual findings and concluding there was insufficient evidence to justify protection under the CAT. As we explain, we deny the petition for review.

I.

A.

Romero was raised in San Miguel, El Salvador by his mother and maternal grandparents. At eighteen, he was pressured into joining the local "clique" of Mara Salvatrucha, also known as "MS-13." Romero initially maintained a low profile in the gang, attending weekly meetings and looking for rival gang members (he never found any). Things changed in November 2001 after Romero refused to get an MS-13 tattoo because of concerns about being publicly linked to the gang. Instead, Romero stopped attending the gang's weekly meetings entirely, abruptly ending his nine-month affiliation.

Soon after, a friend and fellow MS-13 member, Antonio, informed Romero that local clique leaders had ordered his execution. When Romero's grandfather learned of the threat, he sent Romero to live with family in San Salvador, roughly two-and-a-half hours away. Although Romero's former clique learned of the move, it never carried out

2

its threat while Romero lived in San Salvador. In 2004, Romero returned to San Miguel to visit with family. While home, he also met with Antonio, who warned him that the gang had learned he was back and planned to murder him as punishment for leaving three years earlier.

Romero returned safely to San Salvador, where he lived without incident until entering the United States illegally in January 2007. Sometime after March 2010, MS-13 discovered that Romero had moved to the United States. Romero received two online threats from the gang, one in 2011 and another in 2012. Both threats were relayed by Antonio over Facebook, and stated that Romero would be killed if he returns to El Salvador and ended by requesting money.

B.

In February 2010, police in Manassas, Virginia arrested Romero on charges of public intoxication, obstruction of justice, felony assault on a police officer, and destruction of property. Following his arrest, the Department of Homeland Security served Romero with a notice to appear, charging him as an alien who had not been admitted or paroled in violation of section 212(a)(6)(A)(i) of the Immigration and Nationality Act. Romero conceded removability on this basis but was granted several continuances to file applications for relief.

On January 30, 2012, Romero filed an application for asylum, withholding of removal, and protection under the CAT. Romero subsequently withdrew his asylum application and an immigration judge then considered his eligibility for withholding of removal and CAT protection. Romero testified to and presented evidence regarding the

3

events that led to his departing El Salvador. Noting that MS-13 continues to ask about his whereabouts and the threats he received from the gang in 2011 and 2012, Romero testified that he fears he will be killed if he returns to his mother's home in San Miguel. Romero also presented evidence of country conditions in El Salvador and the testimony of Dr. Thomas J. Boerman, an expert on organized crime in Central America. Dr. Boerman opined that based on an interview with Romero, his review of the evidence in this case, his knowledge of how MS-13 operates, the nature of Salvadoran communities, and changed conditions in El Salvador since 2007, "it is a foregone conclusion that MS-13 would learn of [Romero's] return and it is also a foregone conclusion that they would subject him to reprisals over circumstances in the past." J.A. 332.

The immigration judge denied Romero's application for withholding of removal but granted relief under the CAT, which requires a petitioner to show that, if removed, it is "more likely than not that he or she would be tortured" with the consent or acquiescence of the government. 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018).[1]

The government appealed, and the Board of Immigration Appeals affirmed the denial of Romero's application for withholding of removal and remanded his CAT application for further consideration. Specifically, the Board instructed the immigration

---

[1] A public official acquiesces to torture if he or she is aware of the activity constituting torture but breaches his or her legal obligation to intervene or otherwise turns a blind eye to such activity. *See Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013); 8 C.F.R. § 1208.18(a)(7).

4

judge to address Romero's ability to safely relocate to other parts of El Salvador and the Salvadoran government's recent efforts to combat gang violence.

On remand, the immigration judge again granted Romero protection under the CAT. The judge rejected the argument that Romero's previous time living in San Salvador without incident established his ability to safely relocate to other parts of El Salvador, viewing it instead as an indication that "gang members continued to look for [Romero] and had not found him yet." J.A. 96. And the immigration judge added that Dr. Boerman's testimony suggested that Romero's former clique could more easily find him in San Salvador than it could in the past. Finally, the immigration judge concluded that although the Salvadoran government had announced new policies to combat gangs, "the laws will be meaningless" absent sufficient financing. J.A. 99.

The government appealed once again, arguing that the immigration judge's findings as to the likelihood of future torture were clearly erroneous. The Board agreed and denied Romero relief under the CAT. The Board focused on Romero's ability to relocate safely to the capital, San Salvador, as he had in the past, which was not sufficiently rebutted by Dr. Boerman's testimony. Additionally, the Board held that the immigration judge's conclusion that the government's new anti-gang policies would be inadequately financed was "speculative, especially considering the laws had only been enacted in 2015." J.A. 5. Moreover, these new policies supported an opposite conclusion from the one reached by the immigration judge: that the Salvadoran government "is vigilant in combating [] gang members" and that "they are not acquiescing to harm that victims suffer." *Id.*

5

This petition for review followed.

II.

Where, as here, the Board reverses an immigration judge and issues its own opinion, we review only the Board's decision. *See Mena v. Lynch*, 820 F.3d 114, 116 (4th Cir. 2016). We must uphold that decision if it is supported by substantial evidence. *Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014). The Board in turn reviews the immigration judge's factual findings, such as the likelihood of future events, for clear error and his legal conclusions, including whether the burden of proof has been met, de novo. 8 C.F.R. § 1003.1(d)(3)(i)–(ii); *see also Turkson v. Holder,* 667 F.3d 523, 529 (4th Cir. 2012).

We will uphold the Board's "reversal of the IJ's grant of CAT relief if there is substantial evidence supporting the BIA's conclusion that the IJ clearly erred in finding a likelihood of torture." *Kang v. Att'y Gen. of U.S.*, 611 F.3d 157, 164 (3d Cir. 2010). "Conversely, we will reverse the BIA's determination if the evidence *compels* a finding that it is more likely than not that the petitioner will be tortured if removed." *Id.* (emphasis added). In this case, substantial evidence supports the Board's conclusion that the immigration judge clearly erred in finding Romero will more likely than not be tortured by MS-13 if he returns to El Salvador and that the government will acquiesce to his torture. Either of these findings provides a sufficient basis for denying relief under the CAT.

III.

6

Romero may establish the likelihood of his torture through the use of any relevant evidence, though federal regulations provide a list of nonexclusive factors to consider. These include: (i) "[e]vidence of past torture"; (ii) the applicant's ability to "relocate to a part of the country of removal where he or she is not likely to be tortured"; and (iii) "[e]vidence of gross, flagrant or mass violations of human rights." 8 C.F.R. § 1208.16(c)(3)(i)–(iii). Focusing on the second factor, the Board noted that Romero had avoided MS-13 the entire time he lived in San Salvador. And though Romero stated he would return to San Miguel, where MS-13's threats originated, he admitted that relocating to San Salvador remained a possibility. The Board therefore concluded that even if "gang members would seek him out" there was no indication "that they would find him." J.A. 4. We conclude that substantial evidence supports this finding.

Romero relies on Dr. Boerman's testimony to argue that he can no longer avoid MS-13 by simply moving to another city, as he did in the past. But Dr. Boerman's risk assessment was based on the assumption that Romero would return to live with his mother in San Miguel. Dr. Boerman did not consider Romero's ability to relocate to San Salvador even though he conceded that it would affect the risk profile. Nor did Dr. Boerman explain how Romero lived for nearly six years in San Salvador without incident.

The Board also questioned whether MS-13 continues to have interest in Romero given that he has not had any recent communications with the gang. The last time Romero was threatened by MS-13 was in 2012 over Facebook. Before that, he received

an online threat in 2011 and an oral threat in 2004 when he returned to his mother's home in San Miguel. And while MS-13 has continued to ask Romero's family about his whereabouts, none of his family members were told to relay any threats to Romero nor have they been harmed or extorted because of Romero's choice to leave the gang.[2]

Though these events are admittedly concerning, "[w]e are acutely aware that our job as a reviewing court is not to reweigh the evidence before the IJ." *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009). Instead, it is "our responsibility to ensure that [] legally significant evidence is not arbitrarily ignored by the factfinder." *Id.* Here, the Board addressed the competing evidence but determined that Dr. Boerman's opinion and Romero's testimony were insufficient to establish the probability of torture in light of the time that has passed and the roughly six years Romero lived safely in San Salvador. Given our deferential standard of review, we have no cause to disturb this conclusion.

B.

Romero also failed to establish that the Salvadoran government would acquiesce to his torture. Here, Romero relies on the testimony of Dr. Boerman and country condition reports, which describe widespread gang violence and incidents of police corruption alongside escalating tension between the Salvadoran army and street gangs.

---

[2] Romero's son has been pressured into joining a different clique of MS-13 in another part of El Salvador but for reasons unrelated to his father's past membership. Romero testified that his son is being targeted because he is a young man with an absent father, making him generally vulnerable to street gang recruitment.

But we have previously noted such generalized evidence is insufficient to establish a government's acquiescence to torture carried out by criminal organizations. *See Lizama v. Holder*, 629 F.3d 440, 449–50 (4th Cir. 2011) (holding country condition reports on El Salvador were insufficient to establish the Salvadoran government's acquiescence to torture).

The record discloses new efforts by the government of El Salvador to tackle the gang epidemic, including suspending a truce with MS-13 and Mara-18, creating a rehabilitation program for former gang members, partnering with the FBI to modernize the national police force, and increasing prosecutions of public corruption. Romero attacks the efficacy of these policies, but we are a court of review, not a policymaking body. Our task is not to "determine which of the competing views is more compelling. It is instead to ensure that substantial evidence supports the BIA's judgment." *Mulyani*, 771 F.3d at 200. In this regard, the country conditions evidence does not establish that the government is willfully blind to the violence inflicted by MS-13 but is instead actively trying to address the problem.

Romero is also required to prove that public officials "prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). While this standard does not require actual knowledge, only willful blindness, it still requires particularized evidence with respect to the petitioner, rather than the public generally. *See Mulyani*, 771 F.3d at 200; *see also Alvizures-Gomes v. Lynch*, 830 F.3d 49, 55 (1st Cir. 2016); *Zheng v. Ashcroft*, 332 F.3d 1186, 1194–95 (9th Cir. 2003).

9

Here, neither Romero nor his family reported the threats he received from MS-13 to the authorities. Although Romero argues that doing so would be futile, on the record before us it would be entirely speculative to conclude that government officials would turn a blind eye to Romero's safety if made aware of the threats and dangers he faces. Thus the Board's finding is supported by substantial evidence.

## IV.

For the reasons given, we deny the petition for review.

*PETITION DENIED*